THOMAS A. PACHECO, CA SBN 351445
tpacheco@leesegui.com
**LEE SEGUI PLLC**
421 N. Harrington St., Suite 460
Raleigh, NC 27603
Telephone: (919) 421-7782

ALEX R. STRAUS, CA SBN 677434
*astraus@milberg.com*
**MILBERG LLC**
80280 South Beverly Drive, Penthouse
Los Angeles, California 90212

*Attorneys for Plaintiffs and the Putative Classes*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THOMAS COHEN and ERIK PAULSEN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INSINKERATOR, LLC,<br><br>Defendant. | CASE NO. 7:25-CV-10719-PCP<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Deleted: CORRECTED

Deleted: CORRECTED

Thomas Cohen and Erik Paulsen ("Plaintiffs"), by and through undersigned counsel, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendant InSinkErator, LLC ("Defendant" or "InSinkErator") and in support allege, upon information and belief and based on the investigation of counsel, as follows:

## NATURE OF THE CASE

1. InSinkErator designed, manufactured, and sold garbage disposals containing galvanized steel with knowledge that galvanized steel was not suitable for durable, long-term use in garbage disposals due to corrosion and that inexpensive, alternative materials and designs were available. However, despite InSinkErator's knowledge regarding the lack of durability in its design and material selection, it concealed the unsuitability of its design from consumers and profited significantly from the premature failure of the garbage disposals through replacement purchases.

2. As a result, Plaintiffs and Class Members were deceived by InSinkErator, had garbage disposals that not only prematurely fail, but frequently result in significant water damage to their cabinetry and kitchens. As Plaintiffs and Class Members did not receive the benefit of their bargain and would not have purchased the garbage disposals or would not have paid as much for them if they had known the truth about the use of galvanized steel in garbage disposals. Plaintiffs bring this suit individually and behalf of others similarly damaged by InSinkErator's conduct.

3. Established in 1938, InSinkErator claims to be "the world's largest manufacturer of garbage disposals and instant hot water dispensers for home and commercial use."[1]

4. More specifically, InSinkErator touts that "the name InSinkErator® has been synonymous with garbage disposals for over 80 years. *They were our idea*."[2]

[1] *See* https://insinkerator.emerson.com/en-us/about-us (last visited Sept. 9, 2025).
[2] *See id.* (emphasis added).

Deleted: CORRECTED

5. InSinkErator, which offers "a garbage disposal for every household and budget," has three series of household garbage disposals: 1) Badger Series (formerly "Standard Series"), 2) Power Series, and 3) Quiet Series.

6. InSinkErator-branded Badger Models 1 (including Badgers 100 and 1XL) and 5 (including Badgers 500 and 5XL) (collectively "Badgers" or "Class Badgers")[3] are made with galvanized steel grind components and galvanized steel Upper End Frames ("UEFs"), as further detailed below. The Badgers[4] all contain the same or substantially similar designs[5] and manufacturing[6], and specifically, all utilize the galvanized steel components at issue in this case.

7. Badgers have historically, and at all times relevant hereto, had a "design life" of [redacted].[7] In other words, InSinkErator designed the Badgers to remain in service in consumers' kitchens for at least [redacted] from the time of installation until the time of removal.

8. InSinkErator selected these materials, designed, manufactured, distributed, marketed, and sold the Badgers knowing that the galvanized steel's zinc coating will begin to corrode almost immediately once it is installed and exposed to water, leading to irreversible material

---

[3] Badgers 100 and 500 are the Home Depot branded Models, and Badgers 1XL and 5XL are the Lowes branded Models of their respective Badger Model 1 and 5 families.

[4] Plaintiff's counsel has collected significant amounts of evidence in the lead case, *Miller et al. v. InSinkErator, LLC.*, 1:23-cv-03797, filed June 15, 2023. During the discovery period in that litigation, more than 10,000 documents were produced by InSinkErator, as well as numerous depositions taken.

[5] *See* ISE_0026363 (Upper End Frame specifications); *see also* ISE_0027177 (grind components specifications).

[6] *See* ISE_0018765 (steel specifications).

[7] *See, e.g.,* "ISE MANUFACTURING AND TEST STANDARDS" [redacted]) ISE_0042476; Kocha Dep. (30(b)(6) Representative, [Director of Engineering and Quality]) 214:12-216:2, Nov. 12, 2024 (ISE_24167; Exhibits 20 and 21); Just Dep., 24:3-13, Jan. 15, 2025 (testifying that the Design Life of the Badgers has been [redacted] since he began working at [Senior Reliability Engineer] Emerson in 2021); *see also* ISE_0008660; ISE_0042476.



Deleted: CORRECTED

loss.[8] Accordingly, InSinkErator's material selection and design of the Badgers with galvanized steel that corrodes with regular, foreseeable, and intended use is defective (the "Defect"). Therefore, the Badgers are not suitable for their intended use as household garbage disposals that properly and reliably dispose of food waste under the sink and into the home plumbing system.

9. Representative photographs of the Badger 1 and 5[9]:




10. InSinkErator has been selling the Badgers since the 1990s and represents the Badgers to consumers as setting the "standard for reliability and durability," delivering "rugged and reliable" disposers for "years of dependable service."[10]

[8] *See* Kocha Dep. 92:4-21; 100:17-24; 101:1-19; 102:10-23, Nov. 12, 2024 ("if I really want to be technically correct and talk about corrosion, corrosion starts, you know, almost immediately on a metallic surface. I mean, oxidation can start within minutes.").
[9] *See* ISE_0046752.
[10] *See* https://www.insinkerator.com/en-us/support/replacement-guide (last visited Oct. 14, 2025).

Deleted: CORRECTED

11. The Badgers' prices vary slightly depending upon whether a power cord is included and the motor horsepower capacity, but on average are about $129.00 for Badger 1s and $149.00 for Badger 5s.[11]

12. The Badgers currently come with a 2-Year "In-House Full-Service Limited Warranty" for Badger 1s and a 5-Year "In-House Full Service Limited Warranty" for Badger 5s. The current warranties replaced the prior warranty duration of 1 year for Badger 1s and 3 years for Badger 5s.

13. Although InSinkErator does not market the Badgers as "low-end," internal documents[12] reveal that low-end products are exactly what InSinkErator sells to consumers who believe they are buying "durable," "long lasting,"[13] and reliable garbage disposals when they purchase the Badgers.

14. However, InSinkErator relies heavily on its brand recognition to sell its products, including the "low-end" Badgers.

15. Its Brand Positioning Statement describes this strategy[14]:

[11] *See* https://www.insinkerator.com/en-us/insinkerator-products/garbage-disposals/standard-series?_gl=1*1aieazm*_gcl_au*OTI0NjkyMTEzLjE3NTU4OTU1MjIuMTYwNDU3NDY5OC4xNzU1ODk1NTI5LjE3NTU4OTU1Mjk (last visited Aug. 22, 2025) (also showing the difference in the Models relate to motor horsepower and warranty duration).

[12] *See* Plaintiffs' Exhibit (hereinafter "Exhibit") 6 (noting galvanized steel used in "low-end" models); *see also* Exhibit 187.

[13] *See* https://www.insinkerator.com/en-us/insinkerator-products/garbage-disposals/standard-series (last visited Aug. 22, 2025).

[14] *See* Exhibit 8.

Deleted: CORRECTED

[redacted]

16. In keeping with InSinkErator's intention to make "[redacted]"[15] consumers believe InSinkErator sells "[redacted]"[16] with "expertise," it promotes its Badgers as "Durable and long-lasting,"[17] and "Built to last"[18]:

[15] *See id.*
[16] *See id.*
[17] *See* https://www.insinkerator.com/en-us/insinkerator-products/garbage-disposals/standard-series (last visited August 14, 2025).
[18] *See id.*

**Deleted:** CORRECTED




17. In InSinkErator's written materials and on its packaging, InSinkErator consistently utilizes representations regarding its Badgers as using "Rugged Galvanized Steel Construction (*For Disposer Durability*)"[19][20]:

[19] *See* https://www.insinkerator.com/documents/badger-100-garbage-disposal-specifications-en-us-71090.pdf (last visited Oct. 14, 2025) (emphasis added); https://www.insinkerator.com/documents/badger-5-specifications-en-81720.pdf (last visited Oct. 14, 2025); *see also* ISE_0004473 (2022 Badger 1 packaging indicating in the second column from the left that the disposer is "Long Lasting Galvanized steel grind components" (circle added)); ISE_0005314 (2022 Badger 5 packaging indicating in the second column from the left that the disposer is "Long Lasting Galvanized steel grind components" (circle added)).

[20] The Merriam-Webster Dictionary defines durable as "able to exist for a long time without significant deterioration in quality or value." https://www.merriam-webster.com/dictionary/durable (last visited Sept. 8, 2025).

Deleted: CORRECTED




Deleted: CORRECTED




18. Notably, on the face of InSinkErator's website, the Badger Series is the only disposal represented as having qualities relative to how long the disposal should last[21]:

[21] *See id.*; *see also*, comparison chart continuing to represent galvanized steel grind components as being "Long lasting;" however, the stainless steel models are at that time represented as being "rust-resistant" (https://www.insinkerator.com/en-us/insinkerator-products/garbage-disposals/disposal-comparison-chart (last visited Aug. 22, 2025)).

Deleted: CORRECTED

insinkerator PRODUCTS PRODUCT GUIDES KITCHEN BETTER SUPPORT WHERE TO BUY ABOUT US Search

| Horsepower | 1/3 | 1/2 | 3/4 | 3/4 | 1.0 | 3/4 | 3/4 | 1.0 |
|---|---|---|---|---|---|---|---|---|
| Sound | Standard Sound | Standard Sound | Standard Sound | Reduced Sound | Reduced Sound | Quiet SoundSeal® Technology | Quietest SoundSeal® Technology | Quietest SoundSeal® Technology |
| Grind Stages | 1-Stage Grind | 1-Stage Grind | 1-Stage Grind | 2-Stage MultiGrind® Technology | 2-Stage MultiGrind® Technology | 3-Stage MultiGrind® Technology | 3-Stage MultiGrind® Technology | 4-Stage MultiGrind® Technology |
| Grindability | Dependable grind for most food scraps | Dependable grind for most food scraps | Dependable grind for most food scraps | Finer grind designed to prevent clogs[1] | Finer grind designed to prevent dogs[1] | Finest grind designed to prevent clogs[2] | Finest grind designed to prevent clogs[2] | Finest grind designed to prevent clogs, plus a cleansing paddle for odor reduction[2] |
| Lift & Latch® Technology | • | • | • | • | • | • | • | • |
| EZ Connect Disposal | | | | • | • | • | • | • |
| EasySwap Installation | • | • | • | • | • | • | • | • |
| Durability | Long lasting galvanized steel grind components | Long lasting galvanized steel grind components | Long lasting galvanized steel grind components | Rust-resistant stainless steel grind components | Rust-resistant stainless steel grind components | Rust-resistant stainless steel grind components | Rust-resistant stainless steel grind components | Rust-resistant stainless steel grind components |
| Feed Type | Continuous Feed | Continuous Feed | Continuous Feed | Continuous Feed | Continuous Feed | Continuous Feed | Continuous Feed | Continuous Feed |
| In-Home Limited Warranty | 2-Year[3] | 5-Year[3] | 6-Year[3] | 6-fear[3] | 7-Year[3] | 9-Year[3] | 9-Year[3] | 10-Year[3] |
| MSRP | $129.00[4] | $149.00[4] | $179.00[4] | $199.00[4] | $249.00[4] | $299.00[4] | $359.00[4] | $349.00[4] |
| | BUY NOW | BUY NOW | BUY NOW | BUY NOW | BUY NOW | BUY NOW | BUY NOW | BUY NOW |

1 Compared to our 1-stage grind disposals 2. Compared to 1 & 2 stage MultiGrind® Technology 3. See product warranty for details. 4. The listed price may differ from actual selling prices in your area. [22]



[23]

[22] *See* https://www.insinkerator.com/en-us/insinkerator-products/garbage-disposals/standard-series?_gl=1*1aieazm*_gcl_au*OTI0NjkyMTEzLjE3NTU4OTU1MjIuMTYwNDU3NDY5OC4xNzU1ODk1NTI5LjE3NTU4OTU1Mjk (last visited Aug. 22, 2025).

[23] *See id.*

Deleted: CORRECTED

19. As to the specifics of that durability, and as stated above, the Badgers[24] have at all times had a "design life" of [redacted].[25]

20. Prior to the initiation of the preceding *Miller* lawsuit referenced in footnote 4, InSinkErator also previously made representations on its website in its FAQs and in response to complaints on its website, that the Badgers should last 6-8 years.[26]

21. Notwithstanding the design life or prior website representations, the average expected service life of a garbage disposal is at least 10 years according to various industry standards, with the International Association of Certified Home Inspectors stating a service life of 12 years.[27][28] InSinkErator is aware of this data from its own internal market research.

22. One subrogation engineer from Donan CTL (Component Testing Lab) who investigated multiple failed Badgers, noted in his report related to a 5.5 year old failed Badger 100

[24] Plaintiffs' counsel has collected significant amounts of evidence in the lead case, *Miller et al. v. InSinkErator, LLC.*, 1:23-cv-03797, filed June 15, 2023. During the discovery period in that litigation, more than 10,000 documents were produced by InSinkErator, as well as numerous depositions taken.

[25] *See* paragraph 7 n.7 above.

[26] *See* Exhibit 263; Exhibit 80; ISE_0012089.

[27] *See* https://www.nachi.org/life-expectancy.htm (last visited Oct. 14, 2025); https://plumblineservices.com/help-guides/when-should-i-replace-my-garbaInSinkErator-disposal (citing the International Association of Certified Home Inspectors) (last visited Mar. 14, 2023); https://www.bobvila.com/articles/how-long-do-garbaInSinkErator-disposals-last/ (last visited Mar. 14, 2023); *see also* ISE_0022244; ISE_0023460.

[28] Despite widely accepted industry standards, InSinkErator boldly represents to Plaintiff and Class Members that the "industry wide average life of a garbage disposal is 6 to 8 years"—which is not only untrue, but also exceeds the Badger warranty durations. Notably, upon information and belief, InSinkErator removed certain written website representations that the average service life of a garbage disposal of 6–8 years, after and because of the *Miller* Plaintiffs' notice to InSinkErator of their claims in a parallel lawsuit brought in the Northern District of Illinois in June 2023. Instead, InSinkErator now refers consumers to the exact durational term of each warranty. However, despite its attempted remedial efforts, InSinkErator's corrective representation is not applicable to Plaintiffs in this Action or other consumers who purchased prior to the website and other material changes in product representations after notice was provided. Crucially, InSinkErator's customer care employees continue to represent the Badgers as having an average service life of 6-8 years on the website and in direct communications with consumers.

Deleted: CORRECTED

causing water damage, that the Badger had failed prior to the life expectancy noted in the U.S. Department of Housing and Urban Development's guide of 10 years for a garbage disposal.[29] The engineer further concluded that the Badger had prematurely failed, and further noted:

> The significant corrosion inside the garbage disposal suggests than an appropriate material or coating was not used for the application. ***The subject failure is consistent with the manufacturing defect previously seen in multiple InSinkErator brand garbage disposals.***

23. InSinkErator's representations of "durability" and "long-lasting" materials, coupled with the industry standards of an average of more than 10 years of service life, would lead reasonable consumers to believe that in purchasing a Badger they were receiving a garbage disposal that would meet or exceed the undisclosed [redacted].

24. However, despite the explicit representation that the Badgers' galvanized steel materials were used in the design of the Badgers for "Disposer Durability," galvanized steel is an improper material for use in a garbage disposal due to the galvanized steel's exposure to a consistently wet environment full of debris during regular sink and disposal use.

25. Plaintiffs' experts in the *Miller* case had the opportunity to inspect thousands of Badgers returned by consumers and were able to observe that corrosion begins well within the first year of service and causes the Badgers to typically fail before the [redacted] and before the industry standard average of over 10 years.

26. In actuality, InSinkErator's own documents and analysis of years of field returns demonstrate that [redacted] of the Badgers will fail from corrosion within [redacted][30] [redacted] of the Badgers will fail from corrosion within [redacted][31], and [redacted] within [redacted].[32] In total, [redacted] of all Badgers

---

[29] *See* Exhibit 34 (emphasis added).
[30] *See* ISE_0024402.
[31] *See* Exhibit 227a.
[32] *See id*.

Deleted: CORRECTED

will be removed from service *due to corrosion related leakage*.[33] Even more Badgers fail from corrosion related material loss that causes the Badgers to stop working altogether.[34] Furthermore, the data regarding corrosion related failures may be underreported by InSinkErator, as some percentage of field returns being evaluated did not come with data related to the reported failure.

27. These corrosion related failures have historically and continue to [redacted].[35]

28. InSinkErator has been aware of corrosion related failure for decades, as more fully described below. However, InSinkErator intentionally and consistently through the years [redacted].[36]

29. Despite having such knowledge and making the intentional decision to continue using galvanized steel in the Badgers, InSinkErator does not warn or advise consumers that their Badgers are likely to fail prematurely, and failure may result in substantial property damage from corrosion related UEF perforation.

30. Rather, InSinkErator intentionally deceives consumers who call about corrosion or corrosion related symptoms in their Badgers after purchase. Utilizing warranty "scripts," consumer-facing warranty employees routinely and uniformly misrepresent how corrosion impacts the Badgers, including how it affects the duration of the service life of the Badgers.[37]

[33] *See* Exhibit 232.
[34] *See id*.
[35] *See* Exhibit 227a.
[36] *See* Exhibit 35.
[37] *See* Exhibits 90–93.

Deleted: CORRECTED

31. The Defect and corrosion are latent and cannot possibly be seen by a consumer until after a Badger stops functioning or leaks without a consumer taking a flashlight and looking down the sink drain.[38]

32. Based upon expert investigation and general science, the initial corrosion that begins to occur within the first year, inside of the Badgers, is concealed by the sink and plumbing and results in total failure or leakage well before the expected average service life or design life of a garbage disposal.

33. The defective material selection, design, and manufacture of garbage disposers made with galvanized steel components cause foreseeable corrosion, failure, and leakage.

34. As described below, many other feasible alternative materials and designs were available to increase the performance and life of the Badgers related to corrosion of galvanized steel parts. InSinkErator long considered alternative materials and designs but never modified the Badgers to account for the Defect.

35. A review of garbage disposals manufactured by other brands reveals that InSinkErator is one of the only manufacturers that offers models of garbage disposals with all galvanized steel grinding and related components and also does not otherwise provide a lifetime corrosion warranty.[39] The only product that mirrors InSinkErator's poor choice of material selection,

---

[38] *See* Exhibit 31.

[39] *See, e.g.*, https://www.wasteking.com/products/Waste_King/Legend_12_horsepower_garbage_disposal/L-1001 (Waste King Model L-1001 (last visited Sept. 8, 2025); https://www.vevor.com/garbage-disposals-c_13427/garbage-disposal-1-hp-continuous-food-waste-disposer-3270-rpm-ez-connect-corded-p_010180045585 (last visited Sept. 8, 2025); https://www.homedepot.com/p/Trifecte-Scrapper-1-HP-Continuous-Feed-Dark-Green-Garbage-Disposal-with-Sound-Reduction-and-Power-Cord-Kit-HTRI-MCD17-T7-DG/322845371 (last visited Sept. 8, 2025); https://www.homedepot.com/p/GE-1-3-HP-Continuous-Feed-Garbage-Disposal-with-Power-Cord-and-3-Bolt-Adapter-Kit-GFC325N/309413288 (last visited Sept. 8, 2025); https://hemlockhardware.com/products/404847-moen-3-4-hp-galvanized-steel-garbage-disposer-5-year-warranty?variant=42892573409514 (last visited Sept. 8, 2025); https://hemlockhardware.com/products/404843-moen-1-3-hp-galvanized-steel-garbage-disposer-2-year-warranty?variant=42892573311210&utm_source=chatgpt.com (last visited Sept. 8, 2025).

Deleted: CORRECTED

design, manufacturing and poor warranty terms is Amana – a company that, like InSinkErator, is also owned by Whirlpool Corporation.[40]

36. Unsurprisingly, the Defect renders the Badgers unfit for the ordinary purpose for which they are used, which is to properly and reliably dispose of food waste.

37. As a result of the Defect, the Badgers pose an unreasonable risk of harm to consumers' property, as they are subject to premature failure, leakage, and water damage to cabinetry and flooring.

38. Had Plaintiffs, Class Members, and the consuming public known that the Badgers were defective, posed an unreasonable risk of harm to themselves and their property, and would cause damage, they would not have purchased the Badgers at all, or on the same terms or for the same price. Without truthful representations regarding the Defect, Plaintiffs, Class Members, and the consuming public would not otherwise be aware of a uniform Defect in the Badgers and may continue to purchase the Badgers.

39. Accordingly, owners of the Badgers were deprived of material information at the time of purchase and did not receive the benefit of the bargain for what they paid for or received and have been damaged as more fully described herein.

## PARTIES

40. Plaintiff Thomas Cohen is a resident and citizen of Pacific Grove, California.

41. Plaintiff Erik Paulsen is a resident and citizen of Lincoln, California.

42. Defendant InSinkErator, LLC is incorporated in Delaware, with its principal place of business in Wisconsin.

[40] *See* https://www.homedepot.com/p/Amana-A50-W-C-1-2-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-A50-W-C/330951944#overlay (last visited Sept. 8, 2025).

Deleted: CORRECTED

43. At all times relevant herein, Defendant transacted and conducted business throughout the United States, including the state of California.

44. InSinkErator designs, develops, manufactures, distributes, markets, and directs the marketing of its Badgers throughout the United States, including the state of California.

**JURISDICTION AND VENUE**

45. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because: (1) there are one hundred or more (named and unnamed) class members, (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (3) there is minimal diversity because Plaintiffs and Defendant are citizens of different States. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

46. This Court may exercise personal jurisdiction over Defendant because Defendant does substantial business in this State and within this District, receives substantial compensation and profits from the marketing, distribution, and sale of products in this District, and has engaged in the unlawful practices described in this Complaint within this District.

47. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to one or more of Plaintiffs' claims occurred in this District.

**COMMON FACTUAL ALLEGATIONS**

48. In 1927, Wisconsin architect John Hammes invented a food waste disposer, hoping to "eliminate having to take out the garbage by instead grinding food scraps into fine particles and sending them to the local wastewater treatment plant."[41] Mr. Hammes was issued a U.S. Patent for the garbage disposal just 8 years later, in 1935.[42]

---

[41] *See* https://www.insinkerator.com/en-us/about-us/garbage-disposal-timeline (last visited Oct. 13, 2025).

[42] *See id.*

Deleted: ¶

Deleted: ¶

Deleted: CORRECTED

49. The originally patented device is similar to current iterations in that each connects to an electric motor and grinds food waste into small pieces that can be discharged through household plumbing into the sewage system.[43] However, the originally patented device ***specifically calls for the use of non-corrosive materials, such as aluminum***.[44]

50. Just three years following the original patent, Mr. Hammes established "In-Sink-Erator Manufacturing Company" in Wisconsin, where garbage disposals begin production and distribution to homes.[45]

51. By 2007, approximately 50% of homes in the U.S. had a garbage disposal.[46] By 2013, approximately 52% of U.S. households had garbage disposals.[47]

52. As indicated above, since the original InSinkErator company was established, it has become "the world's largest manufacturer of garbage disposals…for home and commercial use."[48] It has increased its product reach to "nearly 80 countries."[49]

53. In 1986, the original InSinkErator, family owned company was acquired by Emerson Electric Company.

54. However, upon information and belief, this acquisition by Emerson is what led InSinkErator—a company, along with its parent company Emerson, committed to providing quality,

[43] *See id.*
[44] US Patent No. US-2012680-A (Aug. 27, 1935).
[45] *See id.*
[46] *See id.*
[47] *See* U.S. Census Bureau 2013 American Housing Survey, https://www.census.gov/programs-surveys/ahs/data/interactive/ahstablecreator.html?s_areas=00000&s_year=2013&s_tablename=TABLE3&s_bygroup1=2&s_bygroup2=4&s_filtergroup1=1&s_filtergroup2=1 (last visited Oct. 14, 2025).
[48] *See* https://insinkerator.emerson.com/en-us/about-us (last visited Sept. 9, 2025).
[49] *See id.*

Deleted: ¶

Deleted: ¶

Deleted: ¶

Deleted: CORRECTED

American-made garbage disposals[50]—to redesign its products with improper materials in order to increase sales.

55. Although the originally patented device specifically calls for the use of non-corrosive materials, such as aluminum,[51] when the Badgers were introduced into the market this specification was ignored in favor of cheaper galvanized steel that would corrode.

56. For the next 38 years, Emerson and InSinkErator continued to select materials, design, manufacture, and distribute the Badgers and other InSinkErator products.

57. By 2015, Rowan, an engineering firm [redacted] acknowledged that InSinkErator's production volumes had reached 5.6 million Badgers per year.[52]

58. For the fiscal period of March 2021–March 2022, InSinkErator's twelve-month revenue was $595 million.[53]

59. On August 8, 2022, Emerson announced it was selling InSinkErator to Whirlpool Corporation for $3 billion, as "a meaningful step in Emerson's continued commitment to creating a higher growth, more diversified and cohesive portfolio."[54]

60. Despite the sale, InSinkErator continued to boast that its products are "Assembled in America," and that the "InSinkErator Quality Policy" is "*The customer comes first and what I do must be right*."[55]

---

[50] *See* https://www.emerson.com/en-us/news/corporate/insinkerator-agreement (last visited Sept. 9, 2025) (Emerson is a "global technology and software company providing innovative solutions for customers in industrial, commercial, and residential markets.").
[51] US Patent No. US-2012680-A (Aug. 27, 1935).
[52] *See* Exhibit 31.
[53] *See* https://www.emerson.com/en-us/news/corporate/insinkerator-agreement (last visited Sept. 9, 2025).
[54] *See id.*
[55] *See* ISE-0032749.

Deleted: CORRECTED

61. However, as described above, the Badger products InSinkErator sells may be assembled in America, but neither quality nor the customer came first when InSinkErator selected corrosive materials in the design and manufacture of the Badgers.

**MATERIALS, DESIGN, AND MANUFACTURE OF THE BADGER**

62. InSinkErator-branded Badgers are made with galvanized steel, including both galvanized steel grind components and a galvanized steel UEF.

63. Galvanized steel is steel with an applied galvanized layer, which is primarily zinc. Zinc is a metal that "is more anodic than steel (i.e., the steel is more noble)"[56] and is applied to protect the steel through its own "sacrificial" corrosion.

64. "In a corrosive environment the zinc layer begins to corrode by uniform corrosion, producing 'white rust.'"[57] Zinc corrosion begins almost immediately through oxidation of its materials. Once the zinc layer has been penetrated and the "bare area expands,"[58] the exposed steel is susceptible to red-colored rust, corrosion and irreversible material loss.

65. As further described in Rowan's report, [redacted][59]:

[redacted];

[redacted]

[redacted]

[56] *See* Exhibit 31, p. 2.
[57] *See id.*
[58] *See id.*
[59] *See id.* pp. 2-3.

Deleted: CORRECTED

66. Each Badger is designed and manufactured using galvanized steel for components that grind food waste into small particles that can easily pass through household plumbing and be disposed into the sewage system.

67. The Badgers are used, and intended by InSinkErator to be used, for reliable and convenient food waste disposal under kitchen sinks.

68. This process is accomplished utilizing various mechanical parts, including an electric motor, food grinding parts, plastic housing, and plumbing fitting.

69. A connection parts diagram and cross-section of the Badger are below[60]:

[redacted]

[60] *See* Exhibit 6.

**Deleted:** CORRECTED

70. There are three key galvanized steel components to the Badgers that are susceptible to corrosion: the UEF, the rotating Shredder Plate, and the stationary Shredder Ring.

71. The rotating "Shredder Plate" is a galvanized steel motorized plate that spins and presses the food against a stationary Shredder Ring.

72. The "Shredder Ring" is a galvanized steel perimeter ring with cutouts that grinds food into small particles that are then dispatched into the "Grind Chamber" below it, for dispersal into plumbing through the plumbing attachment.

73. Collectively these parts make up the "Shredder Assembly," which is responsible for the majority of the Badgers' work in properly disposing of food waste.

74. The Upper End Frame is also made with galvanized steel and is largely superfluous in the Badgers. Many or most other garbage disposals do not have a UEF or similar part.

75. The UEF and Shredder Assembly are contained within a plastic housing or encasement and are designed and manufactured to collect water and grind and dispose of food through the drain outlet into the plumbing.

76. Plastic housing that encases the Badgers conceals the UEF and Shredder Assembly's galvanized steel components.

77. As depicted below, corrosion related perforation of the UEF is the "[redacted]"[61].

[61] *See* Exhibit 6.

Deleted: CORRECTED

[redacted]

78. As described above, zinc is a sacrificial coating that when applied to steel is consumed by corrosion over time. The zinc coating on the Shredder Assembly is abraded away by food being ground against the coating through normal and foreseeable use, at which point rust and discoloration begin the irreversible corrosion process.

79. The abrasion and consumption of the zinc coating leaves the underlying steel with no form of corrosion protection. As a result, the steel also corrodes through normal, foreseeable use which makes the physical deterioration and loss of steel inevitable.

80. Exacerbating the use of galvanized steel is [redacted]

Deleted: CORRECTED

[redacted].[62]

81. Material loss from corrosion causes the Badgers to fail in multiple ways, including perforation of the UEF of the disposals that can result in leakage into cabinetry or other property.

82. The leakage points from this corrosion are as follows:



83. Additionally, this causes the corrosion of the grinding components which prevent the disposal from working to grind food. This corrosive system leads to the premature failure of the Badgers and makes up the [redacted].[63]

84. Despite having decades of data verifying corrosion in the Badgers and the subsequent failure and leak risk, InSinkErator does not disclose the risks of corrosion associated with the use of galvanized steel in the Badgers to consumers.

85. Further, corrosion failure and leaks occur within the Badgers, and begin slow and occur over time such that reasonable consumers will not be able to discern when it is occurring until failure and leaking has already occurred.

---

[62] *See* Kocha Dep. 110:12-13; 141:24-142:5; 198:4-22, Nov. 12, 2024.
[63] *See* Exhibit 227a.

Deleted: CORRECTED

86. The Defect is latent such that no reasonable consumer would know, or be able to discover through inspection, that the material selection of galvanized steel was inadequate.

87. However, InSinkErator knew or should have known of the Defect before it distributed the Badgers into the consumer marketplace.

88. Based on InSinkErator's durability representations and coupled with industry standards, Plaintiffs and Class Members have a reasonable expectation that their Badgers will have more than [redacted] useful service life.[64]

89. However, due to the latent Defect, the Badgers begin to fail within the first year with these corrosion related failures [redacted].[65]

**CORROSION IS THE PRIMARY FAILURE MODE OF THE BADGERS**

90. For decades InSinkErator has known that its garbage disposals were prone to failure, [redacted].[66]

91. [redacted][67]; [redacted].[68]

92. [redacted]

[64] *See* Exhibit 275; *see also* ISE_0007973; ISE_0024402.
[65] *See* Exhibit 218.
[66] *See, e.g.*, Exhibits 22 and 26; Kocha Dep. 219:5-220:13; 235:1-24, Nov. 12, 2024.
[67] *See* Exhibit 22; Kocha Dep. 219:5-220:13, Nov. 12, 2024.
[68] *See* Exhibit 27; Kocha Dep. at 235:1-24, Nov. 12, 2024.

Deleted: CORRECTED

[redacted][69]

93. [redacted]

[redacted][70].

[redacted]

94. [redacted]

95. [redacted][71]

[redacted]

[69] *See e.g.* Pls. Exhibits 6, 27, 31, 227-227a, 229, 232; Kocha Dep. 138:14-21; 235:1-24; 251:18-252:5, Nov. 12, 2024; Just Dep. 91:9-22; 91:23-92:5; 107:3-21; 109:14-22, Jan. 15, 2025.

[70] *See* Exhibit 227a.

[71] *See* Exhibit 31; Kocha Dep. 251:18-252:5, Nov. 12, 2024 (confirming agreement with the executive statement of the Rowan Report, Exhibit 31, which states "This report evaluates [redacted]).



Deleted: CORRECTED

[redacted].[72] InSinkErator conceals the nature of the corrosion-susceptible galvanized steel from consumers and instead represents that this same material is "durable" and "long-lasting" for garbage disposers.

96. [redacted].[73]

97. [redacted][74].

---

[72] *See* Exhibit 31 (estimating an average of [redacted] for claims [redacted]); *see also* Exhibit 230 (email from J. Just to T. Kocha identifying amount of paid property damage claims for "UEF Perforation" for FY15-FY20); Exhibit 232 (analyzing UEF liability claims).

[73] *See* Exhibit 22 (Kocha Dep. 222:6; 223:4, Nov. 12, 2024); Just Dep. 52:4-16; 52:17-23, Jan. 15, 2025.

[74] *See* Exhibit 38.



Deleted: CORRECTED

[redacted]

**Deleted:** CORRECTED

[redacted]

98. [redacted][75]:

[redacted]

[75] *See* Exhibit 227a.



Deleted: CORRECTED

[redacted]

99. This data has largely been consistent over time. [redacted][76].

[76] *See* ISE_0015524.



Deleted: CORRECTED

[redacted]

100. Further, an internal analysis of evaluations of [redacted][77]:

[redacted]

[77] *See* ISE_0023011.



Deleted: CORRECTED

101. [redacted][78].

[redacted]

102. Below is a photograph of the *Miller* Plaintiffs' Badgers which were photographed by the *Miller* Plaintiffs' experts:

[78] *See* ISE_0023993. [redacted]



Deleted: CORRECTED




103. There are two rows of components in the photograph above: the top row consists of the shredder assembly, and the bottom row consists of the UEF. The components come from four samples, one from each of the original Named Plaintiffs in the *Miller* case. The farthest-left sample is Plaintiff Simmons' sample; immediately to the right of the Simmons sample is Plaintiff Miller's sample; to the right of the Miller sample is Plaintiff Hicks's sample; and the farthest-right sample is Plaintiff Schubert's sample.

104. Components from the Simmons sample (farthest to the left) do not suffer from corrosion due to the epoxy coating applied to the UEF and the stainless steel components in that particular garbage disposal, which will extend the life of the disposal.

105. Upon information and belief, the Miller sample was manufactured in December 2018 and was installed from May 2019 to July 2024; the Hicks sample was manufactured in April 2020 and was installed from June 2020 to July 2024; and the Schubert sample was manufactured in September 2016 and was installed from 202 to 2024.

Deleted: CORRECTED

106. These exemplars track what was documented and collected in the hundreds of warranty return samples collected and inspected by Plaintiffs' experts in the *Miller* case:

| | | |
|---|---|---|
|  |  |  |
| Badger 100-3 (SN 23071127206) | Badger 500-4 (SN 23061019423) | Badger 500-4 (SN 23101064517) |
|  |  |  |
| Badger 100-2 (SN_22041429211) | Badger 500-3 (SN 22061041970) | Badger 100-2 (SN 22041068095) |
|  |  |  |
| Badger 100-2 (SN 21051360390) | Badger 500-3 (SN 21011370241) | Badger 100-2 (SN 21071028683) |

107. Unsurprisingly, online complaints track similar conditions and failures.

108. For example, one Amazon user noted multiple Badgers having failed in the same manner, leaking through the plastic housing[79]:

[79] https://www.amazon.com/productreviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&paInSinkEratorNumber=1#reviews-filter-bar (last visited Mar. 14, 2023).

**Deleted:** CORRECTED




109. InSinkErator knows that rust and corrosion will occur when consumers use the Badgers as intended by InSinkErator.[80] Accordingly, the Badgers are not suitable for their intended use as household garbage disposals that properly and reliably dispose of food waste under the sink and into the home plumbing system.

110. Despite years of knowledge and analysis regarding corrosion related failures, InSinkErator intentionally decided not to change the design or materials to eliminate the corrosion or extend the life of the Badgers.

RUST IS IRREVERSIBLE CORROSION, NOT A COSMETIC CONDITION

**Formatted:** Underline

**A. "Rust" in the Badgers is corrosion, not a cosmetic surface condition.**

111. As Plaintiffs' MIT metallurgist and materials science engineer has opined, InSinkErator's use of the phrase "cosmetic" or "surface" rust is "misleading," and at best, "incorrect

[80] *See* Exhibit 232; *see also* ISE_0047227; ISE_0045423.

**Deleted:** CORRECTED

and unscientific,"[81] especially when used to convey to consumers that it "will not affect the life or performance of the disposer."[82]

112. More specifically, this is incorrect and unscientific because "[r]ust is rust" and if it remains in "the same environment it can proceed until the part is corroded through and fails." The "more of a reddish colored thin film is rust," which "will [eventually] affect the life and performance of the disposer."[83]

113. Similarly, Merriam-Webster's definition of "rust"[84] is "the reddish brittle coating formed on iron especially when chemically attacked by moist air and composed essentially of hydrated ferric oxide," or "a comparable coating produced on a metal other than iron by corrosion."[85]

114. The common definition of "cosmetic" is "of, relating to, or making for beauty"; "done or made for the sake of appearance"; or "visually appealing."[86]

115. In other words, applying the two definitions together, as InSinkErator does, creates an unavoidable scientific conflict. To the average and reasonable consumer, it creates the impression that "rust" in the garbage disposals is harmless and superficial, when it is not because it will always to lead to eventual total material loss and failure absent an intervening failure mode.

[81] Declaration and Expert Report of Michael Tarkanian ("Tarkanian Report"), ¶¶ 313-319 (September 22, 2026). Mr. Tarkanian received both his Bachelor of Science degree in Materials Science and Engineering and a Master of Science in Materials Science and Engineering from the Massachusetts Institute of Technology ("MIT"). He has worked in this field, including providing forensic analysis of failed materials, for the past 25 years. He is currently a member of MIT's Department of Science and Engineering teaching staff.

[82] *See* Exhibit 93.

[83] Tarkanian Report, ¶ 314.

[84] https://www.merriam-webster.com/dictionary/rust (Last Accessed Sept. 3, 2026).

[85] As noted in the same definitions, the verb form of rust is: "to form rust; become oxidized." *See id.* (Last Accessed Sept. 3, 2026).

[86] https://www.merriam-webster.com/dictionary/cosmetic (Last Accessed Aug. 26, 2026).

Deleted: CORRECTED

116. To that end, when InSinkErator replied to Mr. Cohen's warranty claim that the "rust" was cosmetic, Mr. Cohen replied by asking if that meant it would "wash away."[87] This was a reasonable assumption by Mr. Cohen and other reasonable consumers when the manufacturer of the product at issue represented that the condition was cosmetic.

117. InSinkErator's use of the word "cosmetic" is ironic given that its use of that word is literally "done or made for the sake of appear[ing]"[88] to be insignificant and superficial in the context of the Badgers performance, having the intended effect of deceiving consumers.

118. This knowing deception is further demonstrated through InSinkErator's internal document titled, "Signs It's Time to Replace Your Disposer,"[89] which identifies multiple conditions that *by InSinkErator's own documents* deem "rust/corrosion" issues that necessitate replacement of the Badgers. A condition that is cosmetic would not cause a product to need to be replaced.

119. The reason the use of "cosmetic" or "surface" rust is misleading, incorrect, unscientific, and leads to conditions warranting product replacement is because this "loss of galvanization—a zinc coating on steel—during normal disposal use will result in steel corrosion and metal loss" – a condition that "is irreversible."[90]

120. In other words, "cosmetic" or "surface" rust is just one stage in the total degradation, material loss, and failure of the Badgers. Once corrosion begins, it does not slow down or stop, and it cannot be reversed.

121. Thus, given how galvanic corrosion occurs, "cosmetic rust" will always lead to total material loss and failure of the Badgers, unless an intervening unrelated cause occurs.

**B. Loss of both the zinc layer and steel results in "rust," which is irreversible and leads to detrimental performance of the Badgers.**

[87] *See infra* PLAINTIFFS' FACTUAL ALLEGATIONS, *Plaintiff Cohen*.
[88] *See* https://www.merriam-webster.com/dictionary/cosmetic (Last Accessed Aug. 26, 2026).
[89] Exhibit 38.
[90] Tarkanian Report, ¶ 19(b) ("Summary of Conclusions").

**Formatted:** Indent: Left: 0.25", Space Before: 0 pt, After: 0 pt, Line spacing: single
**Deleted:** ¶
**Formatted:** Font: 12 pt
**Formatted:** Font: 12 pt
**Formatted:** Font: 12 pt, Not Bold, No underline
**Formatted:** Font: 12 pt, Not Bold
**Formatted:** Font: 12 pt
**Formatted:** Font: 12 pt, Not Bold
**Deleted:** CORRECTED

122. As described herein, "[g]alvanized steel is a type of steel which has been coated with zinc to prevent rust."[91]

123. This zinc coating or layer protects the steel in two ways: (1) as a physical barrier that prevents water, oxygen, and other chemicals from contacting the steel; and (2) as a "sacrificial anode" because zinc is more electrochemically active than steel and preferentially (first) corrodes when the coating is compromised.[92] Stated "simply, the zinc coating corrodes so that the steel will not."[93]

124. That sacrificial protection is finite. The zinc layer dissipates and depletes over time through its own corrosion, wet-dry cycles, and exposure to debris that wears away the zinc and white zinc oxide; once the zinc has dissipated, it can no longer protect the steel, and the remaining bare steel corrodes as if it had no protection at all.[94]

125. This process is *especially problematic inside a garbage disposal because the intended operating environment is consistently wet, humid, and filled with food debris repeatedly ground against the grind assembly and UEF*; with continued use, corrosion and rust spread and worsen over time, compromising the integrity, strength, and performance of the affected parts and the disposal as a whole.[95]

126. So while rust may be "cosmetic" by not impacting the functionality for some *short period of time*, "with continued use of galvanized steel components in a garbage disposal, the corrosion/rust will spread and worsen with time, ultimately compromising the integrity, strength,

[91] *Id.* at ¶ 35.
[92] *Id.* at ¶ 36.
[93] *Id.*
[94] *Id.*
[95] *Id.* at ¶ 37.



Deleted: CORRECTED

and performance of the part and the disposal as a whole."[96] That material loss is irreversible and irreparable.[97]

127. Tim Kocha's, InSinkErator's own Director of Engineering and Quality, testimony also supports these scientific principals and consequences resulting therefrom.

128. As he testified, from an engineering and materials standpoint, corrosion starts almost immediately, even when a part still appears visually fine.[98] Specifically, that is because "corrosion starts, you know, almost immediately on a metallic surface" and that "oxidation can start within minutes."[99]

129. Specifically, when asked what "cosmetic rust" meant in the warranty, Mr. Kocha answered only that he "take[s] that to mean visible rust on a visible component and *whose function is cosmetic in that – in that location*."[100]

130. When asked what benchmark InSinkErator uses to determine when rust has gone beyond "cosmetic rust" and has become corrosion impacting use, Mr. Kocha did not identify any objective benchmark. Instead, he described the distinction only functionally: rust is "more significant than cosmetic when it changes from something visible with no detrimental performance impact to something that affects performance."[101]

131. He further agreed that there is "not a repair once corrosion has set in."[102]

132. As full described herein, this irreversible loss of zinc leads to irreversible loss of steel, and while it may appear to begin with "rust" it will lead to "detrimental performance" of the Badgers such as mechanical failures, operational failures, and water leaks.

---

[96] *Id.* at ¶ 39.
[97] *Id.*
[98] Kocha Dep. 92:4-93:18.
[99] *Id.* at 92:17-21.
[100] *Id.* at 178:10-13.
[101] *Id.* at 178:14-179:6.
[102] *Id.* at 188:24-189:10.

Deleted: CORRECTED

133. InSinkErator's documents are clear – if a Badger does not fail earlier from an infant-mortality or random failure, it will eventually fail because of corrosion.

134. All failures related to corrosion—*every single one*—begins with rust.

**C. Visible brown or red rust simply means the zinc protection has already worn away and the steel is corroding and will corrode until total failure.**

Formatted: Indent: Left: 0.25", Space Before: 0 pt, After: 0 pt

135. Importantly, the color commonly indicating rust means the zinc layer has already worn away and that the underlying steel has begun to corrode and will continue to do so.

136. As described herein, both Plaintiff Cohen's and Paulsen's Badgers exhibit this rust color demonstrating the zinc layer has worn away, and the underlying steel is actively corroding.

137. Thus, for both Plaintiffs, the corrosion has already compromised the structural integrity of their disposals and has and will impact the life and performance of their disposals. This condition in both Plaintiffs' Badgers is irreversible.

**D. The corrosion causes holes, leaks, loss of grinding function, and premature failure.**

138. As more fully described herein, the material loss from corrosion causes Badgers to fail in multiple ways, including perforation of the UEF that can leak into cabinetry or other property, and corrosion of the grinding components that prevents the disposal from properly grinding food.[103] These failures make up the [redacted] in the Badgers. Notwithstanding, corrosion means the steel within the Badgers is actively suffering from the measurable loss of material (albeit, it may not be measurable by an ordinary consumer who lacks metallurgical expertise or tools) which progressively impacts the grind function of the Badgers.

139. As indicated herein, InSinkErator's own [redacted] analysis identified UEF corrosive perforation and shredder plate corrosion among the [redacted] after [redacted] years of service, stated that the [redacted] account for

[103] Exhibit 38.

Deleted: CORRECTED

approximately [redacted] of failures after [redacted] years of service, and acknowledged that UEF corrosion is undesirable because it can result in water leaks through the disposer.

140. By 2022, InSinkErator continued to identify corrosive perforation of the UEF as the [redacted] for Badger disposers, and its materials stated that approximately [redacted] of the population of Badger disposers would be removed from service because of water leakage through the bottom of the disposer.

141. All of these end-of-life corrosion failures modes began as rust.

142. InSinkErator's [redacted] likewise demonstrated the mean life of the product would increase from [redacted] years to [redacted] years if the UEF corrosion failure modes were removed.[104]

143. In other words, the elimination of rust would increase the life of the product. If rust were truly cosmetic, its elimination would have no impact on the life of the product.

**E. InSinkErator knew corrosion was a functional failure mode, not a cosmetic issue.**

144. As described throughout herein, InSinkErator's knowledge of corrosion as a non-cosmetic failure mode is reflected in continuous internal records: [redacted][105]

145. More specifically, [redacted] e"[106]; and throughout the last decade, it identified UEF corrosion as

[104] ISE_0008932, p. 2.

[105] *See* Exhibits 6, 27, 31, 227-227a, 229, 232; Kocha Dep. 138:14-21; 235:1-24; 251:18-252:5, Nov. 12, 2024; Just Dep. 91:9-22; 91:23-92:5; 107:3-21; 109:14-22.

[106] *See* Exhibit 27; Kocha Dep. at 235:1-24, Nov. 12, 2024.

Deleted: ¶
Formatted: Font: 12 pt
Deleted: CORRECTED

the [redacted] of Badgers removed from service because of water leakage from the bottom – all the while representing to consumers this condition is merely cosmetic.[107]

**F. InSinkErator's "cosmetic rust" statements were misleading.**

146. InSinkErator's Guided Assistant instructed agents to tell consumers—like Plaintiff Cohen—who reported rust/corrosion/deterioration inside the unit or grind components that brown discoloration or surface rust is "normal" and "cosmetic,"[108] will not affect life or performance, and is not rust that will compromise structural integrity, while also stating that galvanized components do not begin to discolor until the zinc coating wears away.

147. The same script internally acknowledges that rust can interfere with operation and eventually degrade structural integrity, but nevertheless instructed agents to tell consumers that rust will not degrade disposer performance unless it is well outside the disposer's lifespan – a lifespan not defined by InSinkErator in any public facing document.[109]

148. Mr. Kocha also testified that corrosion is detrimental to UEF performance, including corrosion that weakens the UEF enough that it cannot structurally support motor loads or corrosion that allows water to pass through, would be covered under the warranty as he understood it because the product would not perform as intended; however, the terms of the Warranty clearly preclude this condition as warranty agents consider this condition excluded under the "cosmetic rust" exclusion.

149. Susan Mueller testified that Customer Care would tell a consumer who reported seeing rust in the disposer that the rust is cosmetic, expected, and does not affect product performance.

[107] *See* Exhibit 232.
[108] *See* Exhibits 90-93.
[109] *See id.*



Deleted: CORRECTED

150. Thus, InSinkErator's "cosmetic rust" script contradicted its own engineering and warranty testimony: the company told consumers corrosion was normal, cosmetic, and non-performance-related, while its own witnesses and internal data recognized that corrosion causes material loss, loss of grinding performance, UEF perforation, leakage, property damage, and premature failure.

151. Again, as stated by metallurgist expert Mr. Tarkanian, InSinkErator's use of the phrase "cosmetic" or "surface" rust is "misleading," and at best, "incorrect and unscientific,"[110] especially when used to convey to consumers that it "will not affect the life or performance of the disposer."[111]

**G. Consumers cannot reasonably distinguish "cosmetic rust" from progressive corrosion before failure.**

152. For the reasons stated above, the use of the word "cosmetic" in conjunction with rust leads the reasonable consumer to remove from consideration the possibility that rust might have a detrimental effect on the product and instead to assume it is superficial.

153. Given that the average, reasonable consumer does not have metallurgical training, consumers cannot be expected to understand that these statements from the manufacturer are deceptive and misleading.

154. The average, reasonable consumer would also not know the difference between the beginning stages of rust/corrosion and later stages that result in material loss nearing failure.

155. Likewise, Mr. Kocha testified that because the corrosion occurs inside the disposal, he would "*never* expect a user to know cosmetic rust existed," until there was "enough rust there to cause a negative impact on the product's function."[112]

[110] Tarkanian Report, ¶¶ 313-319.
[111] *See* Exhibit 93.
[112] Kocha Dep. 182:1-18.

Formatted: Font: Bold
Formatted: Space Before: 0 pt, After: 0 pt
Deleted: CORRECTED

156. David Krems, a Vice President at InSinkErator, confirms that it is "completely reasonable" for consumers to be concerned if they become aware of corrosion in their Badgers.[113]

157. Plaintiffs' metallurgy expert, Mr. Tarkanian, testified that corrosion is progressive and that material loss is not necessarily discernible to people without engineering knowledge because the progression is not obvious to a layperson.[114]

158. Additionally, InSinkErator's Warranty makes no effort to distinguish "cosmetic rust" from non-cosmetic rust or corrosion, provides no metric for identifying either condition, and leaves consumers unable to know when rust has reached an amount of material loss that will result in failure; accordingly, characterizing rust as "cosmetic" is arbitrary and misleading because once rusting has occurred, material loss and subsequent failure are inevitable.

159. Despite decades of data verifying corrosion, failure, and leak risk, InSinkErator did not disclose the risk of corrosion associated with galvanized steel in the Badgers, and corrosion failures and leaks begin slowly inside the Badgers over time such that reasonable consumers cannot discern them until failure and leaking have already occurred.

**INSINKERATOR HAD FEASIBLE ALTERNATIVE DESIGNS AND MATERIAL SELECTIONS AVAILABLE**

Deleted: <#>¶

160. InSinkErator had alternative designs, materials selection, and manufacture, including utilizing the same epoxy coating it uses in its Badger 5XPs and 900s (further described below) or utilizing the stainless steel found in its other residential models. Further, InSinkErator's own patents identify that "a structurally rigid plastic material" would be a suitable alternative material instead of galvanized steel that would pose no risk of UEF corrosion.[115]

[113] *See supra* n.150.

[114] Tarkanian Dep. 349:10-22.

[115] ***See*** US Patent No. 7918411 (Apr. 5, 2011); ***see also*** US Patent No. 7578460 (Aug. 25, 2009); US Patent No. 6007006 (Dec. 28, 1999) (specifying that "By integrating the first and second plastic housing via injection moldings and **separately forming the upper end from stamped metal**, the food waste disposer is **easier and less expensive to manufacture**") (emphasis added).

Deleted: CORRECTED

161. [redacted][116] [redacted][117] [redacted].[118]

162. InSinkErator is aware that simply [redacted] as it does with its mid-level models, [redacted]; however, it has chosen not to use this application for these Badger models.

163. Additionally, InSinkErator could have manufactured the Badgers with an alternative design—similar to its competitors—which would not include a UEF and thus would eliminate the primary point of leakage related failure.

164. The cost differential for the consumer in choosing between the model with coating (e.g., Badger 5XP) and without (Badger 1 or Badger 5) is approximately $20.00-$40.00; however, consumers were not provided with the requisite information which would have allowed them to make a meaningful choice between the Badgers made with and without e-coating.

165. InSinkErator is aware of the more appropriate use of stainless steel in its assemblies, because it advertises its use of the "highest durability alloy stainless steel components with LeakGuard Liner™" in its top-end residential models and commercial models.[119] The difference in cost between the least expensive Badger and the least expensive garbage disposal product offered

[116] *See* Exhibit 9; Kocha Dep. 139:4-24; 140:1-2; 162:17-164:6, Nov. 12, 2024.
[117] *See* Just Dep. 95:5-10, Jan. 15, 2025 (from his understanding of the design and manufacturing process).
[118] *See* Exhibit 240.
[119] *See* https://www.insinkerator.com/documents/insinkerator-open-line-disposal-comparison-chart-en-us-70538.pdf (last visited October 14, 2025).

Deleted: ¶

Deleted: ¶

Deleted: CORRECTED

by InSinkErator with the "highest durability alloy stainless steel components with LeakGuard Liner™" is approximately $160.[120]

166. Additionally, upon InSinkErator's request, Rowan [redacted][121]

[redacted]

167. [redacted][122] [redacted]

[120] *See, e.g.*, paragraph 17 n.22 above.
[121] *See* Exhibit 31.
[122] *See id.*



Deleted: CORRECTED

168. Likewise, competitors of InSinkErator address the possibility of disposer corrosion by offering more appropriate designs and material selections to prevent this type of corrosion and leaking, including by utilizing stainless steel or providing lifetime guarantees against corrosion.[123] These garbage disposals are priced the same as or below similar Badger models, indicating that it is economically viable to use stainless steel and/or avoid the risk of leakage due to corrosion.

169. Despite receiving recommendations from Rowan [redacted] InSinkErator chose to ignore them.[124]

**INTENTIONAL FAILURE TO SOLVE CORROSION FAILURES IN BADGERS**

170. [redacted].

171. As noted above, approximately ten years ago, in 2015, InSinkErator commissioned Rowan [redacted]. As a result, Rowan [redacted].[125]

172. [redacted][126]

[123] *See* paragraph 32 n.34 above.
[124] *See* Kocha Dep. 269:20-24, Nov. 12, 2024.
[125] *See* Exhibit 31.
[126] *See id.*

Deleted: ¶
Deleted: ¶
Deleted: CORRECTED

[redacted]

173. [redacted] InSinkErator chose to do [redacted].[127]

174. Despite having a numerous viable, cost-effective alternatives for design and material selection, InSinkErator has [redacted] declined to improve the performance of or eliminate corrosion in Badger UEF's [redacted]. InSinkErator has purposefully designed the Badgers for easy installation to encourage like-for-like disposal replacements.

[127] *See* Kocha Dep. 259:20-24, Nov. 12, 2024; *see also* Exhibit 232.



Deleted: CORRECTED

175. [redacted][128]

**BADGER WARRANTIES**

176. InSinkErator expressly and impliedly warrants, via user manuals, advertisements, pamphlets, brochures, circulars, samples, and/or models themselves, that the Badgers are fit for the ordinary purpose for which they are sold.

177. InSinkErator expressly warrants in its warranty for the Badgers that the Badgers "will be free from defects in materials and workmanship"[129] for the duration of the warranty after installation or purchase, and offers consumers a limited, "in-home" repair or replacement option as the exclusive remedy should a warranty claim be approved. Consumers are able to submit claims for warranties over the telephone, by text message, and online.

178. Each Badgers' warranty contains the same or substantially similar language, with the exception of the durational terms which vary depending upon which Badger model is at issue.

179. InSinkErator's manifest intent that its warranty applies to Plaintiffs and consumer Class Members as third-party beneficiaries is evident from the statements contained in its product literature, including its Warranty, which expressly contemplates its application to customers for residential use.

[128] *See* Exhibit 35.

[129] *See* https://www.insinkerator.com/documents/badger-1-warranty-en-us-120998.pdf (last visited Oct. 14, 2025); https://www.insinkerator.com/documents/badger-5-warranty-en-us-121002.pdf (last visited Oct. 14, 2025).

Deleted: CORRECTED

180. Likewise, it was reasonably foreseeable that Plaintiffs and consumer Class Members would be the intended beneficiary of the products and warranties.

181. Specifically, InSinkErator's warranty (the "Warranty") provides as follows[130]:

> This limited warranty is provided by InSinkErator®, a business unit of InSinkErator LLC, ("**InSinkErator**" or "**Manufacturer**" or "**we**" or "**our**" or "**us**") to the original consumer owner of the InSinkErator product with which this limited warranty is provided (the "**InSinkErator Product**"), and any subsequent owner of the residence in which the InSinkErator Product was originally installed ("**Customer**" or "**you**" or "**your**").
>
> InSinkErator warrants to Customer that your InSinkErator Product will be free from defects in materials and workmanship, subject to the exclusions described below, for a period of [1-5] **years** (the "**Warranty Period**"), commencing on the later of: (a) the date your InSinkErator Product is originally installed, (b) the date of purchase (or delivery if later), or (c) the date of manufacture as identified by your InSinkErator Product serial number.

182. However, the Warranty expressly and deceptively does not cover corrosion related failures and contains a void and unconscionable disclaimer of remedies.

183. This Warranty fails its essential purpose, is unconscionable, and therefore contains no valid disclaimers, as more fully described below, because:

- the Defect in materials exists at the time each Badger leaves the manufacturing facility because every Badger contains galvanized steel in the UEF and shredder assembly;
- the Defect precludes the ability to repair the Badgers because it causes material loss;
- InSinkErator fails to disclose its knowledge of the Defect when contacted by customers about Badger failures;
- InSinkErator misleads and deceives consumers in its Warranty communications;
- InSinkErator fails to provide coverage for Badgers that do fail as a result of corrosion;
- InSinkErator intentionally designs the Badgers to reach total failure outside of the Warranty period; and

[130] *See id.*

Deleted: CORRECTED

- when InSinkErator replaces the Badgers or forces consumers into purchasing replacement Badgers, the replacement Badgers all suffer from the same Defect.

184. As described herein, InSinkErator breached its warranties at the time Plaintiffs and Class Members purchased the Badgers because the Badgers were defective when they came off the assembly line. Thus, at the time the defective Badgers were sold to consumers, InSinkErator was already in violation of its warranties.

185. In addition, the Warranty has several terms that are unconscionable, also rendering disclaimers invalid, for the reasons more fully detailed below.

186. InSinkErator unilaterally imposed the Warranty terms to its own benefit, and Plaintiffs and Class Members did not have any opportunity to negotiate the terms of the Warranty.

187. The Warranty is further unconscionable given InSinkErator's knowledge of the Defect, the existence of the Defect at the point of sale, InSinkErator's failure to disclose the Defect at the time of sale and during Warranty communications, and the premature failure of the Badgers.

188. The Installation Care and Use Manual ("ICU") that comes with the Badgers at the time of purchase contains a step-by-step guide for installing InSinkErator branded garbage disposals, including the Badgers subject to this Action as well as other garbage disposals manufactured by InSinkErator that are e-coated or have stainless steel. Throughout the step-by-step installation instructions, the ICU indicates that there are risks for water leakage, but only in the context of improper installation.[131] The ICU does not warn consumers that leaks may result from corrosion or because the Badgers are manufactured with galvanized steel components.

189. The ICU explains both what it covers (defects in materials or workmanship) as well as what it does not. Expressly excluded from the scope of the warranty is, "Wear and tear expected

[131] *See* paragraph 126 n.97 above; *see also* Exhibits 12 and 13; Kocha Dep. 168:12-170:14, 172:13-15, 173:12-174:12, Nov. 12, 2024.

Deleted: CORRECTED

to occur during the normal course of use, including without limitation, ***cosmetic rust***, scratches, dents or comparable and reasonably expected losses or damages."[132]

190. Accordingly, any disclaimer or limitation included in the Warranty does not apply to the Defect such that "cosmetic rust" is not covered by the Warranty.

191. Notwithstanding that "cosmetic rust" is outside the scope of the Warranty, the Warranty does not distinguish what is "cosmetic rust" from either non-cosmetic rust or corrosion and does not provide a metric for determining what is only "cosmetic rust" as opposed to any other form of corrosion.

192. The characterization of corrosion as "cosmetic rust," is unfair and deceptive because:

- Consumers do not know the difference between what InSinkErator characterizes as "cosmetic rust" versus corrosion that will lead to the premature failure of the Badgers;
- Consumers have no way of knowing when "rust" has reached an amount of materials loss that will result in failure;
- Consumers have no way of knowing that there is rusting beyond "cosmetic rusting" such that absent further explanation, consumers are led to believe that rusting is *only* cosmetic and are otherwise deterred from conducting further diligence or inspections of their Badgers; and
- Rust is not cosmetic and qualifying it as such is arbitrary and misleading because once rusting has occurred, material loss and subsequent failure is inevitable.

193. The Defect renders the Badgers unfit for the ordinary purpose for which they are used, which is to properly and reliably dispose of food waste into the plumbing system.

194. The Defect renders the Badgers unfit for the ordinary purpose for which they are used and as a result, the Badgers fail to meet a minimal level of quality to be considered merchantable:

[132] *See* paragraph 126 n.97 above (emphasis added).



Deleted: CORRECTED

- [redacted][133] The truth about galvanized steel is further concealed by InSinkErator's marketing[134] related to the "durability," "rugged," and "long-lasting" nature of galvanized steel. Galvanized steel cannot be used in wet environments without suffering corrosion, and is thus not an appropriate material for use in garbage disposals;

- Additionally, consumers do not appreciate the risk of leaks that is taken on when purchasing the Badgers. [redacted][135] [redacted][136] The risk of leaks due to the Defect is both high in potential damage from property loss as well high in frequency in light of the millions of Badgers sold per year;

- Consumers have no way of knowing that corrosion will happen in the Badgers under ordinary use. However, after use of the Badgers precisely as described by and consistent with the ICU provided by InSinkErator, corrosion will occur because of the Defect[137];

- Consumers have no way of knowing the Badgers suffer from premature failure due to the Defect. Consumers expect that the Badgers will have a service life of 10 or more years,[138] yet the Badgers only have an [redacted][139] and, based upon decades of data, the Badgers fail far in advance of the [redacted][140];

- The Defect is such that corrosion causes material loss to the steel grind components as the steel wears away in the Badgers. This material loss undermines the grind performance[141] of the Badgers and can result in total failure of the Badger; and

- Moreover, consumers have no way of knowing that corrosion will begin as soon as the Badger is used, and [redacted].[142] The galvanized layer of zinc is intended to provide protection to the underlying steel [redacted]

---

[133] *See* Exhibit 270.
[134] *See* Exhibits 221 and 222.
[135] *See* Exhibit 272.
[136] *See* Exhibit 232.
[137] *See* Exhibit 198.
[138] *See* paragraphs 20 n.30 and 21 n.31 above; *see also* Exhibits 190 and 275; ISE_0007973; ISE_0024402.
[139] *See* paragraph 7 n.7 above.
[140] *See* paragraph 25 ns.32-34 above.
[141] *See* Exhibit 38.
[142] *See* paragraph 7 n.9 above; Exhibit 218.

**Deleted:** CORRECTED

far in advance of the end of the warranty period but would ultimately not be covered under warranty.

195. Had Plaintiffs, Class Members, and the consuming public known that the Badgers were defective, would fail prematurely, and may cause damage to other property, they would not have purchased the Badgers at all, or would not have paid the price they did.

196. In sum, InSinkErator has actively concealed the existence and nature of the Defect from Plaintiffs and Class Members, despite its knowledge of the existence and pervasiveness of the Defect, which dates to well before Plaintiffs and Class Members purchased the Badgers and during warranty communications. Specifically, InSinkErator:

a. Failed to disclose the Defect to consumers, at or after the time of purchase, including when consumers make warranty claims or otherwise complain to InSinkErator or its affiliates about the Defect;

b. Actively concealed the Defect from consumers, at or after the time of purchase, including when consumers make warranty claims, or otherwise complain to InSinkErator about the Defect;

c. Failed to disclose and actively concealed the defect from consumers, including that the Badgers were not fit for their intended purpose;

d. Failed to disclose and actively concealed the Defect from consumers when it improperly and unlawfully denied valid warranty claims; and

e. Failed to disclose and actively concealed the Defect from consumers when it provided them with replacement Badgers that contained the same Defect.

197. As a direct, proximate, and foreseeable result of the Defect, Plaintiffs and Class Members suffered damages, including but not limited to: (a) the difference in value of the Badgers as purchased and the Badgers received; (b) loss of use of the Badgers; (c) property damage; and (d) consequential damage.

198. However, when customers make claims or complain to InSinkErator about the Badgers' failures, InSinkErator routinely denies claims based upon rust and corrosion, and misleads consumers about the eventual impact of the corrosion, as it did with Plaintiff Cohen.

**Deleted:** CORRECTED

199. As a result, consumers are misled into believing that the corrosion is cosmetic and that it will never cause structural failure, significant material loss, failure, or leakage.

200. If InSinkErator were to provide warranty coverage for Badgers suffering from rust or corrosion, it could not provide repair coverage as there is no way to replace the galvanized components after the Badgers have left InSinkErator's manufacturing facilities.

201. Any remedy under the Warranty would result in the provision of a like-for-like model replacement. However, replacing a Badger with a like-for-like disposer only provides consumers with another defective Badger that is likely to fail in the same manner. Consumers are left with no remedy under the Warranty and thus the Warranty, and its disclaimers, fail of its essential purpose.

202. Once a Badger has failed, time is of the essence for homeowners to replace the disposer, particularly if it is leaking in which case the homeowner has lost use of his or her kitchen sink as any water running through the sink will go through the disposer and risk further leakage. [redacted].[143]

203. The mounting flange of a Badger is sealed to the sink. When a failed Badger is removed from service, InSinkErator's proprietary mounting flange and rings remain in place. While Badgers are easily removed, their mounting hardware is much more difficult to remove.[144] The difficulty, cost, and potential collateral damage associated with removing the proprietary Badger mounting hardware makes it more difficult and expensive to switch to a different brand of garbage

[143] *See, e.g.*, Exhibit 241 [redacted].

[144] https://forum.appliancepartspros.com/t/in-sink-erator-flange-removal/302644/10 (last visited Oct. 13, 2025) (A Badger owner sought online advise about how to remove the mounting hardware online and was informed of the need to "use either a blow dryer on hot or a propane torch" in order to loosen the flange).

Deleted: CORRECTED

disposal and encourages consumers to replace their defective Badger with the same or a similar Badger that is likely to fail in the same manner.[145]

204. InSinkErator at all times failed to disclose its knowledge of the Defect to customers during the warranty claims process.

205. InSinkErator goes even further than concealing this defective condition. When a consumer does contact InSinkErator to inquire about corrosion or corrosion related symptoms, InSinkErator has misled consumers, including Plaintiff Cohen, by representing that:

a. galvanized steel is corrosion-resistant;

b. rust and corrosion are merely "cosmetic";

c. rust and corrosion will not compromise the service life of the Badgers; and

d. rust and corrosion will not impact the structural integrity of the disposals.

206. When Plaintiff Cohen contacted InSinkErator via its warranty text message system, the following exchanges were documented by Mr. Cohen:

[145] *See, e.g.*, https://www.homedepot.com/p/InSinkErator-Badger-5-1-2-HP-Continuous-Feed-Kitchen-Garbage-Disposal-Badger-Series-79883-ISE/100091168#see-more-details (last visited Jan. 21, 2025) (representing that the Badger 5 has "Simple DIY installation with 'Twist-On, Twist-Off' quick lock mount to help ensure fast and easy replacement of existing InSinkErator garbage disposer mounts").



**Deleted:** CORRECTED




207. These egregious and misleading representations are made to consumers like Mr. Cohen, contrary to both science and decades of internal data, all with the intent to deceive consumers into disregarding the condition they are complaining about, not to take any further action, and for the Warranty period to lapse so that they are required to pay for a replacement Badger rather than it being covered under the Warranty.

**Deleted:** CORRECTED

208. Thus, when consumers make warranty claims related to leaking, the claims are responded to with entirely misleading information, improperly denied, or consumers are sent or purchase another defective Badger that has failed or is likely to fail again because of the Defect.

209. These warranty claim misrepresentations about the nature and character of corrosion is part of the larger pattern of InSinkErator concealing from consumers what it knows to be true-the Badgers *will all corrode, and will all fail as a result.*

210. InSinkErator had knowledge of the Defect well before Plaintiffs and Class Members purchased the Badgers. In fact, as demonstrated above, InSinkErator has known for decades that the Badgers were designed and/or manufactured with materials that would suffer corrosion failures.

211. The Defect in the Badgers exists at the time the Badgers leave the manufacturer, and before they are purchased by consumers; however, such Defect is latent because no reasonable consumer would know that galvanized steel is not suitable for use in a garbage disposal—in particular given InSinkErator's representations that such material is used for disposal "durability"—and thus, Plaintiffs and Class Members could not have known about the Defect at the time of purchase through any due diligence.

212. As the Defect first results in corrosion of the zinc coating and subsequently the underlying steel, there is no repair or patching that can be accomplished to fix the Defect or resulting material loss and damage. A repair cannot be accomplished because corrosion cannot be reversed once it has begun.

213. Despite InSinkErator's longstanding knowledge of this Defect, InSinkErator has failed to remedy the Defect [redacted][146] [redacted]

[146] *See* ISE_0018765.



Deleted: CORRECTED

[redacted][147]) and also failed to inform consumers of the Defect.

214. Instead, in contravention of InSinkErator's Warranty, which fails of its essential purpose and is unconscionable as more fully described above, InSinkErator has repeatedly denied there is any Defect, misrepresented to Plaintiffs and Class Members the impact of corrosion on the Badgers, and has placed the burden of replacing the defective Badgers and paying for the costs of repairs to the adjacent personal property damaged as a result of leakage caused by the Defect to consumers.

215. Prior to purchasing the Class Badgers, Plaintiffs and other Class Members did not know that the Class Badgers would be designed and manufactured with improper materials for use in a garbage disposal, and would fail and leak, requiring the consumer to prematurely assume the burden of replacement of the Badger and repair to property.

216. Defendant knew or should have known that the Class Badgers were defectively designed and manufactured with improper materials that lead to failure of the Badgers' components and are not fit for their intended purpose of providing customers with a proper and reliable method of disposing of food.

217. Nevertheless, Defendant failed to disclose this Defect to Plaintiffs and Class Members at the time of purchase or thereafter and continued to manufacture the Badgers in the same defective manner.

218. The existence of the Defect is a material fact that reasonable consumers, including Plaintiffs and Class Members, would have considered when deciding whether to purchase the Badgers.

[147] *See id.*



Deleted: CORRECTED

219. InSinkErator is aware that consumers would find information related to the Defect and possibly resulting failures to be material. [redacted][148] [redacted][149] [redacted][150] [redacted][151]

220. Had Plaintiffs and Class Members known about the Defect at the time of purchase, as well as the associated costs related to replacement of the Badgers, Plaintiffs and the Class Members would not have purchased the Badgers or would have paid less for them.

221. Had Plaintiffs and Class Members known about the Defect at the time of purchase, as well as the associated costs related to replacement of the Badgers, Plaintiffs and Class Members also would not have agreed to the Warranty terms or limitations associated with the Warranty.

222. Given the facts above, InSinkErator has actively deprived consumers of the knowledge required to make a decision based on material information and has continued to conceal it from consumers and actively misrepresents the impact of corrosion when Warranty claims are made.

223. In light of the proprietary installation assembly which makes replacement of like-for-like Badgers easy and also imposes costs and difficulty related to uninstalling the assembly, as well as that when consumers inquire about corrosion they will be told it will not affect the performance of their Badgers, Plaintiffs and Class Members are encouraged to replace defective

[148] *See* Exhibit 222.
[149] *See* Exhibit 215.
[150] *See* Exhibit 221.
[151] *See* Exhibit 210.



Deleted: CORRECTED

Badgers with new (but still defective) Badgers. Without truthful representations regarding the Defect, Plaintiffs and Class Members may replace their Badgers with the same or similar models that will also contain the Defect.

## PLAINTIFFS' FACTUAL ALLEGATIONS

***Plaintiff Cohen***

224. In 2021, Mr. Cohen personally purchased a Badger as part of a kitchen remodel project. He had previously owned a home and had used garbage disposals and believed that Badgers were a reliable, durable product that would last 10 or more years based on his prior experience with garbage disposals.

Deleted:

225. Based on his prior experience with garbage disposals and his exposure to InSinkErator's pervasive marketing over a number of years, Mr. Cohen has an understanding of the Badgers and also believes that InSinkErator is a reputable brand offering quality products.

226. At all times, Mr. Cohen used his Badger for normal, household (non-commercial) use and for normal, foreseeable household purposes.

227. The Badger Mr. Cohen acquired in connection with his remodel was a garbage disposal that he himself selected and purchased at Home Depot. At that time, Mr. Cohen was exposed to InSinkErator's representations and omissions of a Defect at Home Depot and the point of sale.

228. However, in or around November 2023, his Badger failed and would not operate, and he immediately sought to replace it.

229. To replace his Badger, Mr. Cohen sought the assistance of a handyman. Mr. Cohen directed the handyman to purchase another Badger.

Deleted:

Deleted: CORRECTED

230. At Mr. Cohen's direction, the handyman purchased a Badger 100 from Home Depot on his behalf, and installed it in Mr. Cohen's home on November 15, 2023. Mr. Cohen understands and believes that this was a one-to-one replacement of his previous model.

231. Mr. Cohen paid a total of $225.09 for the replacement and installation of his Badger 100, approximately $120 of which was for the replacement Badger 100.

232. As with his previous Badger, Mr. Cohen only used his Badger 100 for normal, household (non-commercial) use, and only for normal, foreseeable household purposes.

233. Both the handyman and Mr. Cohen, by virtue of agency and actual exposure from his original purchase and his 2023 purchase, would have been exposed to the point-of-sale materials, packaging, ICU, and warranties, all of which omit that the Badgers suffer from the Defect and that the Defect has a high probability of prematurely failing before the design life and before industry standards of 10 years or more.

234. Upon installation, Mr. Cohen began to regularly use the Badger. From the time of purchase until the incident described below, Mr. Cohen used the Badger as intended and maintained it in a reasonable and foreseeable manner.

235. In or around November 2024, Mr. Cohen inspected the inside of his Badger 100. Upon his inspection, he was surprised to discover what he believed to be a significant amount of rust inside his Badger 100, as shown below:

Deleted: Upon information and belief, t

Deleted: T

Deleted: at Mr. Cohen's direction and

Deleted: <#>¶

Deleted: CORRECTED



Deleted: ¶

236. At the time of the discovery of the rust, Mr. Cohen believed that he was within his 1-year Warranty and decided to make a claim for the rust.

237. On November 5, 2024, Mr. Cohen texted InSinkErator's phone number for text message-based warranty claims.[152]

238. After providing the above-photograph, and inquiring about the rust, Mr. Cohen was told that "brown discoloration or surface rust is normal and simply cosmetic," as well as that the rust "will not affect the life or performance of the disposer," and "[t]his is not rust in the sense that it will compromise the integrity of the unit."

239. When Mr. Cohen inquired whether the rust would "wash away," the InSinkErator agent replied that the "[g]alvanized components are coated with a corrosion resistant zinc and do not begin to discolor until the coating wears away."

240. These representations are blatantly misleading as the zinc corrosion coating is white, whereas brown or red rust is discoloration of the steel. In other words, the "coating has already

[152] *See also* paragraph 145 above.

Deleted: CORRECTED

[worn] away," and the discoloration signals material loss of the steel that will compromise the integrity of the unit and absolutely negatively affect the life and performance of the disposer."[153]

241. Additionally, when Mr. Cohen further pressed the InSinkErator agent about the rust, by saying "[s]o that's not really rust?" the agent replied "[i]t is more discoloration."

242. The warranty conversation ended with Mr. Cohen having no recourse for the material loss which will lead to eventual and complete failure of his disposal.

243. Mr. Cohen expected that his Badger 100 would last 10 or more years and that the Badger 100 would not be defective, prematurely fail, and begin to corrode within the Warranty period, while having a timely Warranty claim denied.

244. Mr. Cohen would expect that if corrosion were occurring within the first year of ordinary use of his Badger 100 that the Warranty would cover the corrosion and that the Warranty would be longer to cover possible leaking due to corrosion.

245. Upon information and belief, any replacement assembly still contains the same Defect, and there is no repair to remedy the problem.

246. Because InSinkErator unlawfully concealed the Defect from Mr. Cohen at the time of his purchase of his first and second Badger, after the Badger 100 was installed in his home and being used, and during his Warranty communication, he did not suspect (and had no reason to suspect) that there was anything wrong with his Badger 100.

247. Additionally, Mr. Cohen was instructed by InSinkErator when making a warranty claim that the corrosion inside his Badger was cosmetic and would not affect the performance of his Badger. Absent truthful representations related to the Defect, Mr. Cohen would purchase another Badger that contains the Defect and will fail in the same way.

[153] *See id.*

**Deleted:** <#>Mr. Cohen's Badger 100 has not performed as expected during its service life. Had he known of the Defectthat the Badger would suffer from corrosion so early in the service life of the product, he would not have purchased the Badger 100 and instead would have selected another disposer model, and/or would have paid less than he did for it. Therefore, he did not receive the benefit of his bargain. ¶
Mr. Cohen may seek to purchase a Badger in the future given the ease with which a replacement Badger can be installed as well as the additional cost and difficulty related to removing InSinkErator's proprietary mounting assembly.

**Deleted:** <#>may

**Deleted:** CORRECTED

248. On November 5, 2024, Mr. Cohen put InSinkErator on notice of the Defect by text messaging the phone number 1-262-233-2231, as described above.

249. Further, written notice was provided to InSinkErator for violation of claims for all putative Class Members on January 16, 2025 as well as on September 11, 2025.

250. To date, InSinkErator has denied that there is any Defect, and continues to oppose Plaintiffs' claims in the *Miller* case despite overwhelming evidence of a Defect.

251. Moreover, while Defendant's Motion to Dismiss was pending, Mr. Cohen's currently installed Badger has suffered performance issues that indicate the disposal is not grinding food as intended.

252. Specifically, in or around August 2026, his Badger began to experience jams and at times sounds as though it is sputtering. These jams are causing the Badger not to grind food as intended.

253. Accordingly, Mr. Cohen's Badger 100 has not performed as expected during its service life. Had he known that the Badger would operate inconsistently with jamming or sputtering with fewer than three years of use, he would not have purchased the Badger 100 and instead would have selected another disposer model, and/or would have paid less than he did for it. Therefore, he did not receive the benefit of his bargain.

254. Mr. Cohen is now considering purchasing a new garbage disposal in light of the performance issues his Badger 100 is experiencing. He would like to purchase another Badger but is unable to because he cannot rely on InSinkErator's product representations in light of InSinkErator's omission of the Defect from the representations InSinkErator makes. Mr Cohen is unable to determine, based on the omission of the Defect, whether the Badger has been improved or if it still contains the Defect and continues to be undisclosed.

***Plaintiff Paulsen***

Deleted: since the initiation of this lawsuit,

Deleted: now-

Deleted: I

Deleted: has begun

Deleted: Mr. Cohen

Deleted: CORRECTED

255. In or around January 2020, Mr. Paulsen himself purchased and installed a Badger 500 in his home. He had prior experience with garbage disposals and believed that Badgers were a reliable, durable product that would last 10 or more years.

256. Based on his prior experience with garbage disposals and his exposure to InSinkErator's pervasive marketing over a number of years, Mr. Paulsen has an understanding of the Badgers and also believes that InSinkErator is a reputable brand offering quality products. At all times, Mr. Paulsen used his Badger 500 for normal, household (non-commercial) use, and only for normal, foreseeable household purposes.

257. However, in or around January 2022, his Badger 500 began to leak from the bottom of the disposer. He was unable to replace it himself at the time it leaked because he needed to leave his home to go to work and instead engaged a handyman to remove his leaking Badger 500 and purchase another one for replacement.

258. Mr. Paulsen specifically requested the handyman to perform a like-for-like replacement of his garbage disposal. Although Mr. Paulsen does not recall the exact model of Badger he previously had, it is his belief and understanding that the handyman purchased a like-for-like replacement Badger 500 from Home Depot.

259. The handyman installed the Badger 500 in Mr. Paulsen's home in or around January 2022. Mr. Paulsen paid for the Badger 500 replacement and installation with cash. Similar to his previous Badger 500, Mr. Paulsen used his Badger 500 for normal, household (non-commercial) use, and it has only been used for normal, foreseeable household purposes.

260. Both the handyman and Mr. Paulsen, by virtue of agency and actual exposure, would have been exposed to the point-of-sale materials, packaging, ICU, and warranties, all of which omit that the Badgers suffer from the Defect and that the Defect has a high probability of prematurely failing before the design life and before industry standards of 10 years or more.

Deleted:

Deleted: relied on

Deleted: The handyman was

Deleted: Mr. Paulsen's

Deleted: Upon information and belief, the

Deleted: and

Deleted: it

Deleted: CORRECTED

261. Upon installation, Mr. Paulsen began to regularly use the Badger. Mr. Paulsen used the Badger as intended and maintained it in a reasonable and foreseeable manner.

262. Mr. Paulsen expected that his Badger 500 would last at least 10 years and that the Badger 500 would not be defective, prematurely fail, and leak within the warranty period.

Deleted: longer than two

263. Mr. Paulsen expected that if corrosion were occurring within the first year of ordinary use of his Badger 500 that the Warranty would cover the corrosion and that the Warranty would be longer to cover possible leaking due to corrosion.

264. Upon information and belief, any replacement assembly still contains the same Defect, and there is no repair to remedy the problem.

265. In or around September 2025, Mr. Paulsen inspected his Badger 500 and identified that his replacement Badger 500 had already begun to experience corrosion:



266. Because InSinkErator unlawfully concealed the Defect from Mr. Paulsen and the handyman at the time of his purchase of his first and second Badger, and after the Badger 500 was installed in his home and being used, he did not suspect (and had no reason to suspect) that there was anything wrong with either Badger 500.

267. Mr. Paulsen's Badgers have not performed as expected during their service life. Had he known of the Defect, he would not have purchased the Badgers, and instead would have selected another disposer model and/or would have paid less than he did for them. Therefore, he did not receive the benefit of his bargain.

Deleted: CORRECTED

268. Mr. Paulsen may seek to purchase a Badger in the future given the ease with which a replacement Badger can be installed as well as the additional cost and difficulty related to removing InSinkErator's proprietary mounting assembly. Absent truthful representations related to the Defect, Mr. Paulsen may purchase another Badger that contains the Defect and will fail in the same way.

269. InSinkErator was put on written notice for violation of claims for Plaintiffs and all putative Class Members on May 18, 2023 pursuant to notice provided on behalf of California consumers and consumers nationwide in *Miller et al. v. InSinkErator, LLC.*, 1:23-cv-03797 (N.D. Ill. June 15, 2023) (Chang, J.).

270. Further, written notice was provided to InSinkErator for violation of claims for all putative Class Members on January 16, 2025, as well as on September 11, 2025.

271. To date, InSinkErator has denied that there is any Defect, and continues to oppose Plaintiffs' claims in the *Miller* case despite overwhelming evidence of a Defect.

272. Mr. Paulsen's currently installed Badger has begun to suffer from performance issues indicating the disposal is not grinding food as intended.

273. Specifically, Mr. Paulsen's Badger has begun to clog and cause his Badger and his sink to fill with water. Because of the clogging, he has to stop using his sink and either wait for the water to drain or run his disposal for longer than expected to clear the clog. Mr. Paulsen does not believe his Badger is performing as expected, and objectively Mr. Paulsen's Badger is suffering from a progressive decline in performance.

274. Accordingly, Mr. Paulsen's Badger 500 has not performed as expected during its service life. Had he known that the Badger would have clogging issues with fewer than five years of use, he would not have purchased the Badger 500 and instead would have selected another

**Deleted:** Moreover, since the initiation of this lawsuit,
**Deleted:** now-
**Deleted:** suffered
**Deleted:** In or around July 2026, his
**Deleted:** begun to experience issues with
**Deleted:** ging,
**Deleted:** water now
**Deleted:** fills
**Deleted:** fills
**Deleted:** when he does his dishes
**Deleted:** CORRECTED

disposer model, and/or would have paid less than he did for it. Therefore, he did not receive the benefit of his bargain.

**THE HANDYMEN WERE PLAINTIFFS' AGENTS**

Formatted: Font: Bold, Underline

Formatted: Normal, Centered, No bullets or numbering

275. To the extent, if any, required by law, Plaintiffs' handymen served as agents during the directed purchase of the Badgers.

276. At all relevant times, Plaintiffs Thomas Cohen and Erik Paulsen were the purchasers, owners, intended users, and intended beneficiaries of the Badgers installed in their homes.

277. The handymen who purchased and installed Plaintiffs' Badgers acted as Plaintiffs' actual, special-purpose agent for the discrete transaction of purchasing, transporting, and installing a replacement garbage disposal for Plaintiffs' homes.

278. The handymen who purchased and installed Plaintiffs' Badgers did so at the direction and with the consent of the handymen and the Plaintiffs.

279. Pursuant to California law, an agent is one who represents another (the "principal") in dealings with third-parties. Plaintiffs' handymen represented Plaintiffs (the principals) in dealings with third-party retailers, including Home Depot and/or other authorized retailers, for the limited purpose of purchasing specific replacement Badgers for Plaintiffs' homes.

280. Plaintiffs authorized their handymen to act on their behalf in connection with the replacement of Plaintiffs' original failed Badgers. This authority included the authority to communicate with retailers as necessary, identify a compatible replacement disposer, purchase the replacement disposer, bring it to Plaintiffs' homes, remove the failed or leaking Badger, and install the replacement Badger.

281. Plaintiffs retained ultimate control over the purchase, and the objective and scope of the agency related thereto. Plaintiffs authorized the replacement of their failed garbage disposals with compatible replacement units for Plaintiffs' own homes, subject to Plaintiffs' direction that the

Deleted: CORRECTED

replacement units be like-for-like and therefore, suitable for Plaintiffs' existing sinks, plumbing, electrical connections, and InSinkErator mounting assemblies.

282. Plaintiffs did not authorize the contractors to purchase disposers for the contractors' own use, for resale, for inventory, or for any purpose unrelated to Plaintiffs' home installations.

283. Plaintiffs' handymen accepted that limited authority and acted on Plaintiffs' behalf to complete Plaintiffs' replacement transactions by obtaining and installing the replacement Badgers that Plaintiffs authorized and paid for.

284. The handymen's purchase of the replacement Badgers was within the scope of Plaintiffs' actual authority. The purchase of a compatible Badger was necessary, proper, and usual to accomplish the purpose of the agency because Plaintiffs needed replacement disposers installed in their homes after their prior Badgers failed.

285. To the extent any contractor selected the precise retailer, checkout method, SKU, or substantially similar Badger model, those acts were incidental to the limited agency and within the ordinary scope of authority necessary to complete Plaintiffs' directed replacement transactions.

286. Plaintiffs paid for, reimbursed, or otherwise bore the cost of the replacement Badgers and their installation. The money used to purchase the Badgers was Plaintiffs' money, and the Badgers became Plaintiffs' property upon purchase and installation. Plaintiffs, not the handymen, suffered the economic loss from paying for defective Badgers.

287. Plaintiffs ratified the handymen purchases to the extent ratification was necessary. Plaintiffs accepted the replacement Badgers, paid for or reimbursed their purchase and installation, allowed them to be installed in Plaintiffs' homes, used them for ordinary household purposes, and asserted ownership and warranty rights in them.

288. Accordingly, the handymen's acts in purchasing the replacement Badgers were Plaintiffs' acts for purposes of the purchase transactions. Plaintiffs bargained for and paid for

**Deleted:** CORRECTED

durable, reliable, non-defective household garbage disposals suitable for properly disposing of food waste under a kitchen sink and into the home plumbing system.

289. Plaintiffs' handymen purchased the replacement Badgers for Plaintiffs' benefit and within the scope of their authority. All rights, interests, and injuries arising from those transactions accrued to Plaintiffs, including the right to receive non-defective goods, the right to receive the benefit of the bargain, the right to rely on material product representations and omissions made in connection with the purchases, and the right to seek relief for economic injury caused by Defendant's concealment and misrepresentations.

290. Defendant's marketing, packaging, product specifications, warranties, ICUs, authorized-retailer listings, and other uniform representations were directed to the intended end users and owners of the Badgers, including homeowners such as Plaintiffs.

291. Accordingly, Plaintiffs directly and through their agent handymen were explosed to these uniform representations, as well as the omission that the Badgers contained a Defect that would likely lead to premature failure prior to the end of the design life of the Badgers and before the expected service life of 10 years.

292. Defendant's omissions were material to Plaintiffs and to their handymen agents acting within the scope of the purchase transactions.

293. Although the purchases were expressly directed and authorized by Plaintiffs, Plaintiffs ratified the purchases once installed in the home and once the Badgers and related installation was paid for by Plaintiffs.

294. Defendant knew and intended that Badgers would be purchased for installation in consumers' homes through multiple ordinary channels, including direct consumer purchases, purchases through authorized retailers, and purchases completed by contractors, handymen, plumbers, or installers acting for homeowners.



Deleted: CORRECTED

295. Defendant knew and intended that homeowners would be the persons who paid for, owned, used, relied on, and were affected by the Badgers, even when a contractor, handyman, plumber, installer, retailer, or other intermediary physically completed the purchase or installation. Defendant's warranties, manuals, product materials, and in-home service representations confirm that Defendant intended its representations and warranties to reach the residential consumer owners and users of the Badgers.

296. Had Plaintiffs or their agents known the truth about the Defect at the time of purchase, Plaintiffs would not have authorized the purchase of the replacement Badgers, would have instructed their agents to purchase non-Badger disposers or other disposers with corrosion-resistant components, and/or would have paid substantially less for the Badgers.

297. Plaintiffs' injuries occurred at the time of purchase because Plaintiffs paid money for Badgers that were represented, warranted, and understood to be durable, reliable, and fit for ordinary household food-waste disposal, but instead received products containing an undisclosed Defect (with undisclosed consequences) that existed when the units left Defendant's possession and control.

298. Plaintiffs' injuries were also concrete and particularized because the Defect has manifested in Plaintiffs' Badgers through the development of irreversible corrosion, material loss, impaired reliability, loss of the benefit of the bargain, and the need to incur or face premature replacement costs. Plaintiffs did not receive what they paid for: properly functioning, non-defective, durable, reliable disposers suitable for ordinary household use over their design and expected service life.

299. Defendant's concealment and misrepresentations were a substantial factor in causing Plaintiffs' injuries because Plaintiffs and their agents acted without material information that Defendant possessed and withheld.

Deleted: CORRECTED

300. Defendant's omissions deprived Plaintiffs and their agents of the ability to make informed purchase decisions, including whether to purchase a Badger, whether to replace a failed Badger with another Badger, whether to pay the price charged for a Badger, whether to incur the cost and difficulty of switching to a different brand, and whether to accept Defendant's warranty limitations.

301. Plaintiffs continue to face a real and immediate risk of future injury because their current Badgers are installed on InSinkErator mounting assemblies and have already exhibited corrosion and/or failure symptoms. When those units are able to be replaced, Plaintiffs will again need to decide whether to purchase a Badger given its ease of installation from the mounting assembly, a similar InSinkErator product, or a different disposer requiring additional cost, labor, and potential modification of their existing sink and plumbing configuration.

302. In light of the mounting assembly installed, Plaintiffs do not merely speculate that they may purchase another Badger. Plaintiffs are likely to consider and, absent truthful disclosures or corrective relief, purchase or authorize the purchase of another Badger because the existing InSinkErator mounting assemblies make like-for-like replacement faster, cheaper, and less disruptive than removing the proprietary mounting hardware and modifying the installation for a different brand.

## ARTICLE III STANDING

303. Plaintiffs and similarly situated Class Members have suffered economic injury which confers Article III standing. *See MacDougall v. Am. Honda Co., Inc.*, No. SACV 17-1079 JGB (DFMx), 2023 WL 9687349, at *5 (C.D. Cal. Oct. 3, 2023) ("Where the plaintiffs' injuries consist of economic losses (i.e., the diminished value of their vehicles due to an undisclosed defect), the plaintiffs need not have ***experienced*** the defect to have standing.… Plaintiffs seek recovery for the 'overpayment, loss in value, or loss of usefulness' of their allegedly defective vehicles.") (emphasis

Deleted: <#>¶ ... [1]
Deleted: KNOWLEDGE OF THE DEFECT¶ ¶
Formatted: Normal, Centered, No bullets or numbering
Formatted: Font: Italic
Deleted: CORRECTED

in original). Where "Plaintiffs contend that class members paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so they have suffered an Article III injury in fact." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013) (cleaned up).

304. Plaintiffs' and Class Members' economic injury occurs at the point of sale from the undisclosed Defect contained in the Badgers. Because the Defect was undisclosed, Plaintiffs, directly and through their agents, as well as Class Members overpaid and/or lost value from the Badgers as they would not have purchased the Badgers or paid as much for them had they known about the Defect. "Benefit-of-the-bargain theories," like the one presented herein, "are a classic measure of damages." *Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2020 WL 1955643, at *48 (N.D. Cal. Apr. 23, 2020).

305. Overpayment is the "quintessential injury-in-fact." *Johnson v. Nissan N.A.*, Inc., No. 22-16644, 2024 WL 4784367, at *2 (9th Cir. Nov. 14, 2024) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011)). Moreover, "the law is clear that overpayment is a viable theory of economic injury and that Plaintiffs can satisfy the injury in fact requirement by showing that the defect caused them to overpay for their vehicles." *Siqueiros v. Gen. Motors LLC*, 676 F.Supp.3d 776, 825 (N.D. Cal. 2023) (internal quotation marks omitted). Overpayment "is the standard measure of damages under the CLRA and of restitution under the FAL and UCL." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 865 (9th Cir. 2025).

306. Defendant's improper material selection of galvanized steel for its Badgers is an inherent design Defect in each and every Badger garbage disposal purchased by putative Class Members. "The defect itself is the injury." *Doucette v. Kia Am. Inc.*, No. CV 24-731-DMG (DFMx), 2025 WL 4678049, at *6 (C.D. Cal. Mar. 31, 2025) (citing *Nguyen v. Nissan N.A., Inc.*, 932 F.3d 811, 822 (9th Cir. 2019)).

Formatted: Font: Italic
Formatted: Font: Italic
Deleted: is
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Deleted: d
Formatted: Font: Italic
Formatted: Font: Italic
Deleted: CORRECTED

307. The Defect is inherent in all the Badgers and therefore the injury is not "hypothetical." The injury occurs "regardless of whether an individual experienced a problem with the" Badgers because the Defect was present in all Badgers at the time of purchase. *Maldonado v. Apple, Inc.*, 333 F.R.D. 175, 190 (N.D. Cal. 2019).

308. Manifestation of the Defect is not required for satisfying Article III standing when the injury consists of economic losses tied to the overpayment for a product. *See MacDougall*, 2023 WL 9687349, at *5. "Post-sale conduct," such as the "benefits received after purchase" from use of the Badgers, "is irrelevant because benefit of the bargain damages should be measured at the time of sale." *Id.* at 14. How to interpret failure rates—and whether to credit Plaintiffs' or Defendant's interpretations of the data—is a question reserved for the jury and does not implicate a benefit-of-the-bargain theory of damages. *See Maldonado v. Apple, Inc.*, No. 3:16-cv-04067-WHO, 2021 WL 1947512, at *4 (N.D. Cal. May 14, 2021) ("*This is a merits dispute*. A jury might credit Apple's interpretation of the data as evidence that Pecht's theory is incorrect. But that does not mean individual issues predominate; it would mean the plaintiffs could not prove their case if a jury agreed with Apple.") (emphasis added).

309. Manifestation of failure, as described in *Nissan*, is not required to establish standing for any of the causes of action alleged herein. *See Johnson v. Nissan N.A.*, Inc., No. 22-16644, 2024 WL 4784367 (9th Cir. Nov. 14, 2024)

310. However, manifestation in the context of the Badgers is the development of corrosion, which begins with the almost immediate corrosion of the zinc layer, as described by Mr. Kocha.

311. Manifestation of failures is somewhat a factual quagmire.

312. For example, a Badger which is leaking due to internal component failure may still operate. However, the continued performance of a leaking Badger would not negate the existence

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Deleted: M

Deleted: presents a factual quagmire.

Deleted: CORRECTED

or manifestation of the Defect. Upon information and belief, consumers experience this precise phenomenon, where a Badger is able to grind food but simultaneously leaks due to corrosion of its internal components.

313. However, manifestation of corrosion and eventual corrosion related failure is certain, and not hypothetical without an intervening failure cause. This certain manifestation is true for each Badger purchased and used by putative Class Members.

Deleted: M

Deleted: —

Deleted: —

314. Based on metallurgical principles, galvanized steel suffers from corrosion upon exposure to water. Any use of the Badgers requires exposure to water by design. Corrosion will manifest in each Badger upon intended and foreseeable use.

315. Both Plaintiffs Cohen and Paulsen allege that corrosion has manifested in their Badgers as both have visually observed rusting on the interior of their Badgers.

316. The visible rust observed by Plaintiffs Cohen and Paulsen was not a speculative future issue; it was direct evidence that the zinc protective layer had already been eliminated and irreversible steel material loss was actively occurring.

317. Additionally, Plaintiffs allege performance issues that have manifested, which is a "triable issue." *See MacDougall*, 2023 WL 9687349, at *5. Specifically, Plaintiff Cohen has experienced a clogging issue which is causing his Badger to sputter. Plaintiff Paulsen has experienced jamming. Both clogging and jamming are consequences of corrosion which ties these performance issues to the Defect by both InSinkErator's own documents and Plaintiffs' expert, Mr. Tarkanian.[154]

Formatted: Font: Italic

318. Article III standing does not impose a privity requirement – i.e., direct purchasing is not legally required in order to plead a benefit of the bargain theory of harm, for purposes of standing

[154] *See* Exhibit 38, "Signs It's Time to Replace Your Disposer."

Deleted: CORRECTED

or otherwise. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225–27 (9th Cir. 2015) ("That one would have behaved differently can be presumed, or at least inferred, when the omission is material."); *see also In re Tobacco II Cases*, 46 Cal. 4th 298, 327–28, 207 P.3d 20, 40–41 (2009) ("[T]he plaintiff is not required to allege that those misreprsentations were the sole or even the decisive cause of the injury-producing conduct."); *Hirsch v. BHS Home Appliances Corp.*, No. SACV 21-01355-CJC (DFMx), 2022 WL 4596692, at *3 (C.D. Cal. July 21, 2022); *Alger v. FCA US LLC*, 334 F.R.D. 415, 430 (E.D. Cal. 2020); *Doyle v. Chrysler Grp. LLC*, 663 F. App'x 576, 578 (9th Cir. Oct. 24, 2016).

319. Notably, InSinkErator does not sell direct-to-consumers. The choice to design and manufacture but ultimately distribute the product to authorized retailers for sale to end consumers does not immunize a manufacturer for liability related to its defective products.

## INSINKERATOR'S ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE DEFECT

320. As described above, InSinkErator knew or should have known when it sold the Badgers to the public that the Badgers suffered from the Defect, and that the Defect caused the Badgers to malfunction during their expected useful life, fail prematurely, and might result in significant property damage to consumers and the public.

321. Based on InSinkErator's metallurgical and engineering knowledge, it has known since the Badgers were created with galvanized steel components that those components would corrode, leading to eventual failure of the disposal to effectively grind food as represented and intended.

322. In fact, InSinkErator founder John Hammes recognized the necessity of corrosion resistance in his original 1935 garbage disposal patent where he called for "a cylindrical casing

**Formatted:** Font: Italic

**Formatted:** Font: Italic

**Formatted:** Font: Italic

**Formatted:** Font: Italic

**Formatted:** Font: Italic

**Formatted:** Normal, Centered, Indent: Left: 0.75", Line spacing: single, No bullets or numbering

**Deleted:** CORRECTED

formed from any desired material, preferably of a non-corrodible nature, such as aluminum."[155] InSinkErator has known since its inception nearly 90 years ago that it was not preferable to use corrodible materials in its garbage disposals.

323. [redacted]

324. InSinkErator's knowledge of these facts is established through its use of alternative design and materials selection in more expensive [redacted] as well as through consumer complaints, including several years of public Internet posts on consumer websites, complaining that the Badgers failed during normal use.

325. InSinkErator's knowledge of these posts is established by the fact that the company **has been responding to such posts since at least 2011**. Despite its knowledge of and ability to remedy the Defect, InSinkErator chose to neither remedy it nor remove the Badgers from the stream of commerce, and/or improperly denied warranty claims.

326. Importantly, InSinkErator does *nothing* to warn consumers that galvanized steel will corrode, resulting in material loss to those components to such a degree that the disposal will fail and may cause significant property damage to consumers as the failure can manifest as leaking.

[155] *See* US Patent No. US-2012680-A (Aug. 27, 1935).

**Deleted:** CORRECTED

327. InSinkErator does nothing to provide consumers with information necessary for them to make informed purchase decisions about the true durability of the Badgers, including as compared to other InSinkErator disposals or its competitors.

328. Rather, the ICU only advises that premature corrosion may occur through *improper installation*, but makes no mention that corrosion occurs through normal and foreseeable use due to the materials used to perform key functions in the Badgers.

329. Additionally, the ICU instructs homeowners to "routinely" check under their sink for leaks; however, it does not explain what is "routine," that leaks may form on the backside of the disposal which might not be visible to the owner, that the Badgers *will* corrode and leak through regular use, or that the location for the source of a leak would distinguish a Badger with improper installation from a Badger with UEF perforation caused by corrosion.

330. More than a decade of customer complaints are still available online regarding the Badgers. For example, consumers noted:

From Josh on Amazon in December of 2011, "**Another cracked case – Pick a different disposer!**" (Photograph Included in Paragraph 16)[156]:

> AVOID THIS PRODUCT! I'm yet another owner with a cracked case on my Badger 1 which led to leaks. The internal blades are also completely rusted. The disposer probably only lasted about two years before the crack occurred. The best feature of this disposer is that it's easily replaced with a better unit because of the common mounting system. I can't believe anyone continues to buy this after reading reviews.

By PowerGuru in 2014[157]:

**Avoid it if you don't use it much or for rentals**

When it's brand new, it works as expected and as well as ones that cost 2-3x as much.

---

[156] https://www.amazon.com/product-reviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (last visited Mar. 20, 2023) (emphasis added).

[157] https://www.homedepot.com/p/reviews/InSinkErator-Badger-5XP-W-C-3-4-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-and-Putty-Free-Sink-Seal-Badger-Series-BADGER-5XP-W-C-FLG-SEAL/329061762/5 (last visitedd Oct. 13, 2025).

Deleted: CORRECTED

> The little lugs are stainless, but every other metal parts inside is galvanized steel (steel with zinc coating). I doubt you'll have problems if you use it daily, but after about a year or two, the coating wear out and rusting gets increasingly worse and loses the ability to sit for more than a few days without seizing up. You'd have to break out the unjamming wrench to get it unstuck. I just don't really cook much and don't use mine often, so I've been having to turn it on every day to avoid it from happening. It's been like that for the past two years, but I didn't use it often enough to bother with replacing it. When it rusted so bad that it broke, I had to replace it... and I'm just getting around to reviewing it now. I think when people write reviews, they do it soon after purchase and haven't owned it long enough to see the lack of durability in the long run. This is definitely one of those products meant to deliver very good instant gratification. Got a used stainless steel model Evolution recently and haven't had this problem. That one's 4 years old and the chamber still looks brand new after cleaning. If I knew the Badger was going to turn out like this, I would've skipped it from the beginning. I've never felt that it didn't have enough power and the noise doesn't bother me at all given that its such a short duration, but you can't find stainless one in this size, so you're pretty much forced to go with 3/4 hp or 1 hp. Don't buy it for hp. Buy it for stainless construction.

From S. Eason in October of 2015, "**After finding a puddle coming from under the sink cabinet…**"[158]:

> After finding a puddle coming from under the sink cabinet the other day, I looked inside and found the floor of the cabinet soft and rotting. My badger 1 has been slowly leaking from a crack for a while I didn't catch it. My Badger came with the house and is at least 7 years old, but it's only been used sparingly -no bones, peelings, lettuce, etc. I would definitely look at a different model or brand.

From Smokey, also in 2015[159]:

**Really bad case material. Weak and corrosion prone material.**

> Was installed when house was built. Noticed corrosion in vertical crack lines around the exterior of the grind chamber. Some of the crack lines have started to leak. There are several thin vertical cracks every few inches. They start as small cracks then corrode and leave rust ridges eventually leaking through several of the cracks. Have applied silicone as temp fix but other cracks have now started leaking. The case appears to be aluminum casting but it must be steel based and very thin because if has cracked in several places and the rust builds up on a mound on the exterior of the crack then it starts to leak. I nearly purchased another of the same brand at the home depot store but checked online and saw many low reviews for this product. I found a waste king on the home depot website for $30.00 less ($54.99) regular price. The Waste King has a 2 year in home warranty and a LIFETIME corrosion warranty. I then checked to see if this one also had a corrosion warranty. No this product did not

158 https://www.amazon.com/product-reviews/B00004U9JP/ref=cm_cr_unknown?ie=UTF8&filterByStar=two_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (last visited Mar. 20, 2023).

159 https://www.homedepot.com/p/reviews/InSinkErator-Badger-5XP-W-C-3-4-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-and-Putty-Free-Sink-Seal-Badger-Series-BADGER-5XP-W-C-FLG-SEAL/329061762/5 (last visited Oct. 13, 2025).

Deleted: ¶

Deleted: ¶

Deleted: CORRECTED

> seem to have a corrosion warranty so I ordered the Waste King. See the attached photos for the cracks. I have removed the heavy rust from several of the crack so I could apply silicone to stop the leaks until I can get a replacement.

From Kevin Koch in September of 2016, "**Switching brands because these things are junk**"[160]:

> What a piece of junk. Bought my house in 2009 and just discovered a crack in the casing. I'm suspecting a manufacturing defect to be completely honest. I understand that they only a 1 year warranty on the motor but that wasn't the part that failed. In my use cases it should have lasted forever. I've NEVER put any large objects or bones or anything through it. In fact, the only thing I've ever put down it are egg shells and vegetable scraps.
>
> It had issues of occasionally not chewing things up small enough and would cause a clog in the drain which I would have to remove the trap for. Bought a waste king with lifetime warranty and I'll never have to worry again!
>
> Photograph Included:



By Wappa in 2017 ("One Star")[161]:

[160] https://www.amazon.com/product-reviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (last visited Mar. 20, 2023).

[161] https://www.amazon.com/product-reviews/B000EW7LGA/ref=cm_cr_arp_d_viewopt_mdrvw?

Deleted: CORRECTED

Plastic housing cracked and leaked all the way around

Photographs Included:




By 33899 in 2017[162]:

**Badger5 is leaking from numerous crack around its plastic casing. Totally surprised by this, assu...**

> Badger5 is leaking from numerous crack around its plastic casing. Totally surprised by this, assumed casing would be strong enough to withstand torque. It is not.

From Eric D. in July of 2019, "Housing failed in less than 3 years. Cheap, unreliable and potential liability"[163]:

> The Badger 1 insinkerator came installed with our new house purchase in July 2016. Today, I noticed a large amount of water in the cabinets under our kitchen sink. Upon investigation, I found two holes in the housing of this garbage disposal (see picture, just to the upper left of the pvc pipe. How they got there is a mystery. It can't be from high quality manufacturing though.

---

ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (last visited Mar. 23, 2023).

[162] https://www.homedepot.com/p/reviews/InSinkErator-Badger-5-1-2-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-Putty-Free-Sink-Seal-Badger-Series-BADGER-5-W-C-FLG-SEAL/329061757/4 (last visited Oct. 13, 2025).

[163] https://www.amazon.com/product-reviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (last visited Mar. 20, 2023).



**Deleted:**

**Deleted:** ¶

**Deleted:** CORRECTED

We rarely use this thing, and it's never even jammed up. We don't abuse it with bones, silverware or glasses. And when I called insinkerator, they offered to send me a coupon to purchase another one, but I was in such a hurry because we needed to do our dishes that I ended up buying one from Home Depot.

I would avoid this cheap model and spring for a more expensive one that does not use galvanized steel. This is not even what I would describe as builder grade. It is a liability with the water damage we could have sustained if we didn't notice it in time. We bought a 900 model which uses stainless steel and I'm hoping it lasts longer.

From SteelyGrey in 2020[164]:

**Lasted for less than two years.**
**Would Not Recommend**

Bought at Lowe's to replace an older Badger unit which also only lasted a few years. Noticed water under the sink today which was leaking out onto the floor. The flange to the sink is OK, the drain plumbing is also OK. Water is leaking through the housing and out the bottom of the motor unit when water is even just being run in the sink. This unit is only run for 15-30 seconds a couple times a week. ISE used to be a great company and I've had older units that lasted 10-15 years. The entire Badger line is total "Builder Grade" junk. Will NEVER buy an ISE product again in my lifetime. Never buy any product if the company only offers a one year warranty. This means they don't trust their own products to even offer a 2-3 year warranty.

From ePetFan as recently as February 1, 2022, subject reading "Unacceptable Design Quality in Materials (Metal)"[165]:

I recently had to follow-up on a Badger Model 500-1A, 1/3 HP, 6.3 Amp under the sink food disposer that kept jamming and freezing up. The jam was easily overcome by disposal wrench and no obstructions were noticed in the spinning basin. There was friction to the rotation that I noted that seemed too high. I worked to clean any organic or other debris from the basin concentrated soap and high water with lots of rotation and spinning of rotor with the wrench. Once rinsing with lots of water, I even oiled the rotating parts with cooking again with lots of rotation. The friction seemed to be lessening, but in test operation with water flowing the disposal continued to spin for a moment and then jam, then trip the breaker. On further inspection on disassembly I saw the problem; the spin platten and chamber had extensively rusted and corroded. *Just for curiosity, I checked the manufacture date with the manufacturer and the unit was less than 4 years old! With many years of experience with Sears Craftsman units (>30 years) of the same power and design, I have never seen this level of corrosion in such a short time.* The construction of this model is unacceptable for using interior body metals that do not have basic corrosion resistance to municipal water. I am going to check with the water company for typical

164 https://www.lowes.com/pd/InSinkErator-Badger-5XL-Garbage-Disposal-1-2-HP/5000109263 (last visited Oct. 13, 2025).

165 https://www.amazon.com/product-reviews/B00004U9JP/ref=cm_cr_arp_d_viewopt_mdrvw?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&mediaType=media_reviews_only&pageNumber=1#reviews-filter-bar (last visited Mar. 20, 2023) (emphasis added).

Deleted: ¶

Deleted: CORRECTED

> pHs of their water but is very unusual not to have buffered water a little on the basic side. The acidity of the municipal water can not explain the excessive corrosion seen with this Badger unit. What we have here is a unit built so cheap that it should not be sold. I explained this to the manufacturer, but they seemed okay with this level of quality. My advice is to avoid this brand completely, This type of oversight in design speaks to a company that does not value manufacturing quality products.

Photo Included:



From MacDiddy on March 7, 2022[166]:

**Poor Quality**
**Would Not Recommend**

> This disposal was bought in 2018 and now only four years later has developed a large crack in the upper housing. Judging by the amount of rust it has been leaking for awhile before being finally discovered. Quality control issue I think judging by the other reviews of the same thing happening.

[166] https://www.lowes.com/pd/InSinkErator-Badger-5XL-Garbage-Disposal-1-2-HP/5000109263 (last visited Oct. 13, 2025).



Deleted: CORRECTED



From CM on February 25, 2023, "**Smart design to make them rust intentially[sic], forcing you to buy a new one every few years**"[167]:

> Original unit only lasted 6 years before leaking. Removed and opened it to find exact same failure as many YouTube videos showing exactly how they all fail. They are made of steel that rust. Considering how they are always wet, these units rust badly and develop holes on the motor cover causing a leak. Is it safe to have water drip on the 120V electric motor? I suspect they use rusty steel on purpose so you would have to replace them every few years. Have you heard of stainless steel? Even a plastic cover would be better than a thin raw steel cover.
>
> Thanks to Amazon, a replacement unit arrived the same day. If you have time to do some research, look for a brand that uses stainless steel. Regular steel will rust out in few years - by design.

From D. Jerger on March 4, 2023[168]:

> Keep a spare. *Will rust out at the end of warranty*. Was easy to replace though. Upper housing is cheap pop metal and easy to damage when trying to unstick.

March 16, 2023 from booger, "**Only lasted 2 years**"[169]:

> We spent the extra money and bought this because we were told it is a good brand.

[167] https://www.amazon.com/product-reviews/B00PM8STLM/ref=cm_cr_unknown?ie=UTF8&filterByStar=two_star&reviewerType=all_reviews&pageNumber=1#reviews-filter-bar (last visited Mar. 20, 2023).

[168] *See id.* (emphasis added).

[169] *See id.*

Deleted: ¶

Deleted: ¶

Deleted: ¶

Deleted: CORRECTED

However, it did not even last two years. Both seams on the sides of the garbage disposal split so it leaked everywhere! We were very disappointed because we hardly used it. We are not people that cook a lot or put lots of things down the garbage disposal so needless to say we were upset that we had to purchase another one within two years of installing the first one! So you might not want to buy this brand.

From BILL, a verified purchaser, on September 12, 2023[170]:

This is a piece of junk. It is replacing the same one that rusted out in about 2 years. I only got it because the one I wanted didn't line up and would have required a plumber.

From Dan1876 on February 4, 2024, "**Rusted till it froze completely**"[171]:

This was installed in my house when it was built. About 4 years after the install it would lock up after sitting until the next day but I was able to get it free with the wrench. I contacted support and it was out of warranty. They went by manufacturer date not when it was installed although it would have been slightly out of warranty anyway. A couple months later it was completely locked and no matter how much pressure I put the wrench couldn't move it free anymore. Looking into the unit through the drain hole after I removed it the entire inside was rusted and it didn't budge at all when pushing with the wrench. I replaced it with an advanced model that's stainless steel. I am disappointed that support didn't help at all when I started having the problem.

From RacineWisconsinguy on March 22, 2024, "**Don't buy if you have a choice**"[172]:

This is the third Badger in less than SEVEN YEARS! The only reason I bought it is I was recovering from surgery and had to have someone else install it and it would have been more expensive to modify my plumbing to install a quality product. Next time I'll modify my plumbing. When I had to replace a Badger THREE YEARS ago, the comment back fromthe manufacturer was that like all appliances they wear out, NO OTHER APPLIANCES I HAVE HAVE WORN OUT IN OVER 10 YEARS.

From Tks4Nuttin on April 27, 2024, "**JUNK! Galvanized grinder. Failed after 5 years**"[173]:

Just bought a house in FL. House is 5 years old. The disposal just started leaking out of the power cord hole. Yikes. Date code on this unit is 2018. It's the original installed in the house. The innards of the grinding area are corroded to all h--l. Everything else

[170] https://www.homedepot.com/p/InSinkErator-Badger-5-1-2-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-Badger-Series-79883A-ISE/300278672 (last visited Oct. 13, 2025).

[171] https://www.homedepot.com/p/reviews/InSinkErator-Badger-5-1-2-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-Badger-Series-79883A-ISE/300278672/3#overlay (last visited Feb. 13, 2025).

[172] https://www.homedepot.com/p/reviews/InSinkErator-Badger-5-1-2-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-Badger-Series-79883A-ISE/300278672/3#overlay (last visited Feb. 13, 2025).

[173] https://www.homedepot.com/p/InSinkErator-Badger-5-1-2-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-Putty-Free-Sink-Seal-Badger-Series-BADGER-5-W-C-FLG-SEAL/329061757 (last visited Oct. 13, 2025).

Deleted:

Deleted: ¶

Deleted: ¶

Deleted:

Deleted: ¶

Deleted: CORRECTED

> works great. What a shame that they could have spent another dollar on stainless instead of galvanized, and this thing would still be running. I have a 20 year old unit elsewhere that's still working.

From Isac4 on June 17, 2024, "**Leaked and ruined my cabinet**"[174]:

> The machine only lasted 18 months and quietly failed. To add insult to The injury, it leaked water all over the cabinet, ruining the wood. I did not notice until foul smell came from under the sink. Terrible failure mode. I've had garbage disposals failed, but never did one leak. I do not recommend it at all until that failure mode is fixed by the manufacturer

From Need Better Quality on January 30, 2025, "**Low quality internal parts that rust**"[175]:

> My first Badger 5 failed 2 years after installation. The motor hummed, but the impeller failed to turn---likely frozen in place. I replaced it with a second Badger and it too failed after less than 3 years, this time making scraping sounds. I reached inside and pulled out 7 large rusted metal pieces of debris.

331. InSinkErator knows about these complaints, as it has been responding to them for years and repeatedly blaming consumer usage conditions. Furthermore, InSinkErator has consistently contended that rust is "normal wear and tear," and that "[r]ust will not degrade the performance of the disposer unless it is well outside of the disposer's lifespan."[176]

332. As early as *2011*, a consumer submitted a report to the Consumer Product Safety Commission ("CPSC") regarding the Model 1-83 (Badger), stating the following[177]:

> **Incident Description**: The water leaks through the top of the garbage disposal and goes all the way down the motor department. The unit was orginally installed about 4 years and the failure has been occuring for a few months. They attempted to press the reset button on the bottom of the garbage disposal and it worked for a short period of time (amount of time unknown). While opening the bottom cabinet door they noticed that the unit had began leaking water through the motor again. ***The firm was contacted on 6/3/2011 and a report with the representative (name unknown) and was advised that the unit was no longer covered under a warranty and there wasnt anything that they would be willing to do***. The garbage disposal was removed and

[174] https://www.homedepot.com/p/InSinkErator-Badger-5-1-2-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-Putty-Free-Sink-Seal-Badger-Series-BADGER-5-W-C-FLG-SEAL/329061757 (last visited Oct. 13, 2025).

[175] https://www.homedepot.com/p/reviews/InSinkErator-Badger-5-1-2-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-Badger-Series-79883A-ISE/300278672/3#overlay (last visited Feb. 13, 2025).

[176] *See* responses to Faizi and SteveE below.

[177] *See* https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1186013 (last visited Oct. 13, 2025) (emphasis added).

Deleted:

Deleted: ¶

Deleted: ¶

Deleted: ¶

Deleted: CORRECTED

placed in the garage. It has not been replaced with a replacement unit.

**Incident Date**: 4/1/2011

**Incident Location**: Home/Apartment/Condominium

InSinkErator responded to the CPSC report by stating:

> CPSC Report ID 20110607-8DBA3-1186013 The purpose of this response is to reply to the June 7, 2011 online submittal of the above-referenced consumer complaint. Subject garbage disposer was produced in May of 2006 and came with a 1-year in-home full service warranty. The InSinkErator Division of Emerson Electric Co. has not had an opportunity to examine the unit that is the subject of this report nor seen any documentation of the installation. Our Products Claims Administrator has spoken with the submitter who agreed to forward the disposer for further review at InSinkErator. There is no danger of electrical shock presented by the circumstances of this incident. Correct installation of this garbage disposer requires the use of a grounded electrical connection, which will protect against electrical shock in situations such as this. Furthermore, this product is constructed in compliance with UL Standard ANSI/UL 430 covering Waste Disposers.

333. The reports of leakage related to the Badgers and InSinkErator's inadequate responses continued for years, including as follows:

From Merkin2016[178]:

**JUNK**
**Would Not Recommend**

> We hardly use our garbage disposal at all. We put only small delicate material in it that is usually too fine to fish out of the sink. However, it developed 2 CRACKS in the upper housing. This caused a host of problems such as flooding under the sink, ruining some product stored there, water damage requiring tear out of toe kick, etc. for remediation. This was only 5 years old. It still looks new in appearance, but caused quite a mess due to poor manufacturing material. I believe the upper portion is pot metal or thin cast metal that just shook itself apart. SPEND THE EXTRA MONEY TO GET A BETTER UNIT. IT WILL BE CHEAPER IN THE LONG RUN. (Picture shows only one of the two cracks)
>
> Hi, this is Jerica from InSinkErator® Customer Service. I do apologize for the inconvenience that you encountered with your disposer. Our customer's experience and satisfaction with our products are very important to InSinkErator and I would like the opportunity to assist you with this. Kindly send an email to insinkeratorfeedback@emerson.com with your complete contact information and serial number of your disposer and I will get in touch with you. Thank you.

[178] https://www.lowes.com/pd/InSinkErator-Badger-5XL-Garbage-Disposal-1-2-HP/5000109263 (last visited Oct. 13, 2025).

Deleted: CORRECTED



By Ant in July of 2020[179]:

**It worked great for 14 months, but noticed a leak and then a hole in the larger, upper section. I...**

> It worked great for 14 months, but noticed a leak and then a hole in the larger, upper section. I'm guessing something punctured it but I only remember one time where a small metal item may have been inside and turned on for seconds upon hearing it. Also 3/4 HP is a little on the loud side.

by Ant

**Response from InSinkErator**

Jul 20, 2020

> Hi Ant, I'm sorry to hear about what happened with your disposer. If there's a hole in the unit, it's possible that something may have compromised the body of the disposer but, through use, has just manifested. We're proud of our products and we always ensure you receive the best quality. If we find a flaw, we fix it and stand behind it, that's why they carry a warranty for all quality issues. Details about our warranty policy can be found in your product's manual or our website: https://bit.ly/2WCnwHm. Should you have other questions, please feel free to contact us at insinkeratorfeedback@emerson.com.

From Faizi in June of 2021[180]:

**Rusts and Leaks**

> Very disappointed in this product, have had previous insikerator model which lasted many years. When the motor burned out, I purchased it again thinking the build quality would be the same, it's not. Only after 4 years of very light use started leaking from the bottom due to rust, even though the unit functions fine. Called customer service they gave be a coupon for 40% off of a new unit, no thank you. Switched over to Everbilt 1/2 horsepower with a 4 yr warranty and lifetime corrosion warranty

[179] https://www.homedepot.com/p/InSinkErator-Badger-5XP-W-C-3-4-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-Badger-Series-BADGER-5XP-W-C/302453560 (last visited Oct. 13, 2025).

[180] https://www.homedepot.com/p/InSinkErator-Badger-5XP-W-C-3-4-HP-Continuous-Feed-Kitchen-Garbage-Disposal-with-Power-Cord-Badger-Series-BADGER-5XP-W-C/302453560 (last visited Oct. 13, 2025).

Deleted:

Deleted:

Deleted: ¶

Deleted: CORRECTED

> for half the price.

by Faizi

**Response from InSinkErator**

Jun 14, 2021

> Hi Faizi, we appreciate you sharing your feedback with us. Just as is expected with other small home appliances, the life of an InSinkErator® Disposer is entirely dependent upon service conditions, usage patterns, and water quality. The amount of rust or discoloration varies and is dependent on usage and what may have been put through the disposer. Rust will not degrade the performance of the disposer unless it is well outside of the disposer's lifespan. We're sorry to see you go, but we completely understand how upset you must feel. We hope you'll consider InSinkErator again in the future.

From SteveE in March of 2022[181]:

**Beware of this garbage disposal**

> After only 3 years, my disposal started leaking from the bottom. This was the 3rd Insinkerator disposal in 14 years so I decided to take this one apart before buying another. Insinkerator advertises the chopping area is galvanized, but once the galvanization wears off, the steel quickly rusts. This happen [sic] to mine so severely that it rusted a hole that allowed water to get into the motor compartment (see the blue circled area in the picture). No more "galvanized" and no more Insinkerator!

**Response from InSinkErator**

Mar 31, 2022

> Hi SteveE, thanks for posting your review. We understand how unpleasant this experience must have been for you and we're sorry. Rust is something we generally consider normal wear and tear. The grinding components on our standard Badger Series are coated with corrosion resistant zinc and do not begin to discolor until this coating wears away. The amount of rust varies and is dependent on usage and what may have been put through the disposer. The water quality, use of aggressive cleaning solutions, or even grinding of acidic foods can speed up discoloration. We're always working hard to improve our products and we value your candid feedback.

**Response from InSinkErator**

July 28, 2023

> Hi Richard, thank you for sharing with us, and we're sorry that you had to replace your disposers in such a short period of time. Rust is something we generally consider normal wear and tear. If it rusted from the inside or the grinding components, it would not affect the life or performance of the disposer unless it was well outside of the disposer's lifespan of 6–8 years. If it rusted on the outside of the disposer or on the mounting assembly, it's more likely caused by the disposer not being fully tightened when installed to create the watertight seal between the mounting ring and gasket. We have strict quality control measures in place to ensure you receive a high-quality

[181] *See id.* (last visited Oct. 13, 2025).

Deleted: CORRECTED

> product. If we find a flaw, we stand behind it, which is why we have a warranty for all of our products. If you need assistance, you can always reach out to us via https://support.insinkerator.com/app/ask.

334. Reports of leaks from consumers continued into 2023 and 2024.

From homebubba on January 25, 2023, "**Replaced my less than 5 year old unit insinkerator with...**"[182]:

> Replaced my less than 5 year old unit insinkerator with this unit...yeah go figure,5 years and shorted out from rust leak. Who knows should have to another brand...got lazy since I did not have to change the sink attachments.

**Response from InSinkErator**

Jan 26, 2023

> Hi homebubba, thanks for your feedback. We're sorry to hear that your previous disposer was leaking. The possible causes when the unit is leaking could be an improper installation or water running to bottom from a higher leak. If you will encounter ay issues with your new disposer, please contact us via https://support.insinkerator.com/app/ask.

Dcatx, a Lowes Verified Pro, recorded his Badger leaking and provided a link in his review of his Badger 1XL and titled the review "**DESIGNED TO FAIL"** on February 12, 2023 to which InSinkErator did not respond[183]:

> Would Not Recommend
>
> The Badger 1xl is CHEAP and JUNK. Notice what the grind chamber is made of? Galvanized steel. You know what happens when galvanized steel is exposed to water every day? This is what happens: https://www.youtube.com/shorts/8YMOnL9ezbk That's my Badger 1. It works great for a few years and then it fails because surprise, steel rusts. Look at the competition; they're all using plastic and polymer grind chambers. That's because they're not cheap junk.

Further, JHS1 submitted the following review on January 13, 2024 entitled "**Disappointing**" wherein the consumer describes the bottom of the Badger rusting out, to which InSinkErator denied any issue rust and impressed upon the consumer that it takes "product durability seriously"[184]:

> Would Not Recommend

---

[182] https://www.homedepot.com/p/InSinkErator-Badger-5-1-2-HP-Continuous-Feed-Kitchen-Garbage-Disposal-Badger-Series-79883-ISE/100091168 (last visited Feb. 13, 2025).

[183] https://www.lowes.com/pd/InSinkErator-Badger-1-Series-1-3-HP-Continuous-Feed-Garbage-Disposal/5000296517 (last visited Oct. 13, 2025).

[184] https://www.lowes.com/pd/InSinkErator-Badger-1-Series-1-3-HP-Continuous-Feed-Garbage-Disposal/5000296517 (last visited Oct. 13, 2025).

Deleted: ¶

Deleted: CORRECTED

> Very disappointed in the product's durability. We had to replace it after a few years when the bottom rusted out.

**Response from INSINKERATOR**

January 19, 2024

> Hi JHS1, we're sorry for the disappointment our product has caused you. Rust is something we generally consider normal wear and tear. It will not degrade the performance of the disposer unless it is well outside of the disposer's lifespan. We take product durability seriously and are constantly working on enhancing the reliability of our products. Your loyalty to our brand is appreciated. If you have any concerns, please don't hesitate to reach out to us via https://support.insinkerator.com/app/ask.

335. In conjunction with InSinkErator's vast experience with garbage disposals, including designing, manufacturing, and selecting materials for and selling the Badgers, these facts and complaints illustrate that InSinkErator knew or should have known of the Defect.

336. InSinkErator has a duty to disclose the Defect and to not conceal the Defect from Plaintiffs and Class Members. InSinkErator's failure to disclose, or active concealment of, the Defect places Plaintiffs and Class Members at risk of property damage.

337. Upon information and belief, InSinkErator is currently still selling the defective Badgers, concealing the Defect, failing to notify consumers of the Defect, and failing to recall the Badgers.

338. Moreover, InSinkErator continues to falsely represent through written warranties and manuals that the Badgers are free from Defects in materials, are of merchantable quality, and will perform dependably for years.

339. When communicating with customers, InSinkErator does not disclose that the Badgers suffer from the Defect. Instead, the Defect is described as non-structural, cosmetic, and discoloration that will not impact the performance of the Badgers.

340. As a result, reasonable consumers, including Plaintiffs and Class Members, purchased and used, and continue to purchase and use the Badgers in their homes even though they will prematurely fail.

**Deleted:** CORRECTED

341. Further, InSinkErator routinely denies claims as being out of warranty, when it knows that the Defect exists at the time of sale but typically does not manifest until after expiration of the Warranty.

342. Had Plaintiffs, Class Members, and the consuming public known that the Badgers were defective, would prematurely fail and cause damage to their property, they would not have purchased the Badgers or would not have paid the same price.

343. InSinkErator has wrongfully placed on Plaintiffs and Class Members the burden, expense, and difficulty involved in discovering the Defect, replacing the Badgers (potentially multiple times), and paying for the cost of damages caused by the Defect.

## TOLLING OF THE STATUTE OF LIMITATIONS

### A. Discovery Rule Tolling

344. Plaintiffs and Class Members could not have discovered through the exercise of reasonable diligence that their Badgers were defective within the time-period of any applicable statutes of limitation.

345. Among other things, neither Plaintiffs nor the other Class Members knew or could have known that the Badgers contain the Defect, which causes leakage and damage to other property.

346. Further, Plaintiffs and Class Members had no knowledge of the Defect and it occurred in a part of the Badgers that is not visible to consumers. InSinkErator attempted to conceal its knowledge of the Defect or otherwise capitalize on it further by selling defective replacement Badgers. Accordingly, any applicable statute of limitation is tolled.

347. Seeking any information from InSinkErator related to corrosion in the Badgers would be futile, as InSinkErator's warranty scripts are misleading, inaccurate, and ultimately are intended to dismiss corrosion altogether.

Deleted: CORRECTED

**B. Fraudulent Concealment Tolling**

348. Throughout the time period relevant to this action, InSinkErator concealed from, misled, and failed to disclose to Plaintiffs and the other Class Members vital information about the Defect described herein.

349. InSinkErator kept Plaintiffs and the other Class Members ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiffs nor the other Class Members could have discovered the Defect, even upon reasonable exercise of due diligence.

350. Throughout the Class Period, InSinkErator has been aware that the Badgers it designed, manufactured, selected materials for and sold contained the Defect, resulting in premature and accelerated degradation of the Badgers and eventual leakage.

351. Despite its knowledge of the Defect, InSinkErator failed to disclose and concealed, and continues to conceal, this critical information from Plaintiffs and the other Class Members, even though, at any point in time, it could have disclosed the Defect through a product recall, individual correspondence, media release, or by other means.

352. Plaintiffs and the other Class Members justifiably relied on InSinkErator to disclose the Defect in the Badgers that they purchased, because the Defect was hidden and not discoverable through reasonable efforts by Plaintiffs and the other Class Members.

353. Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class Members have sustained as a result of the Defect, by virtue of the fraudulent concealment doctrine.

**C. Estoppel**

354. InSinkErator was under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the defective Badgers.

Deleted: CORRECTED

355. InSinkErator knowingly concealed the true nature, quality, and character of the defective Badgers from consumers.

356. Based on the foregoing, InSinkErator is estopped from relying on any statutes of limitations in defense of this action.

## UNCONSCIONABILITY AND FAILURE OF ESSENTIAL PURPOSE OF THE EXPRESS WARRANTIES AND BY EXTENSION RENDER DISCLAIMER OF REMEDIES INVALID

357. The Warranty relating to the Badgers is unconscionable in at least the following ways:

a. InSinkErator concealed exclusion of corrosion related failures from being covered under the Warranty;

b. InSinkErator excluded "incidental, special, indirect, or consequential damage" from Warranty coverage regardless of whether it is caused by product "nonperformance," despite knowing that premature failure of the Badger would almost certainly cause such damages;

c. InSinkErator excluded damages "caused by delay in performance" from Warranty coverage, despite knowing that such delay could cause catastrophic property damage to the homeowner;

d. InSinkErator excluded damages that "exceed the price paid by the original owner for the InSinkErator product" from Warranty coverage, knowing that the damages resulting from premature failure of the Badgers would almost certainly exceed the price of the Badger;

e. InSinkErator knew or should have known of the Defect in its Badgers prior to and at the time of sale of the Badgers to consumers, including from consumer complaints, many of which were directly reported to InSinkErator, as well as from Warranty claims made directly to InSinkErator;

f. InSinkErator was in a superior position to know of, remedy, and disclose the Defect in its Badgers to Plaintiffs and Class Members, who could not have known of the Defect at the time of purchase;

g. Plaintiffs and Class Members had no bargaining power as they were unable to negotiate the terms of the Warranty, including the scope of coverage, durational time limitation, or disclaimers contained therein. This is further evidenced by the fact the "complete InSinkErator warranty is included in the ICU *packaged with each unit*,"[185]

[185] *See* https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-dispos

Deleted: CORRECTED

and that the duration of the Warranty is contained on a label on each Badger when it leaves InSinkErator's manufacturing facilities, which therefore demonstrates the Warranty is non-negotiable prior to or at the time of purchase;

h. Plaintiffs and Class Members had no meaningful choice in the terms of the Warranty, including the scope of coverage, durational time limitation, or disclaimers contained therein;

i. Plaintiffs and Class Members had no meaningful choice in choosing another brand of garbage disposal, as any other reputable brand would likewise have warranties containing the same or similar terms and limitations and did not have sufficient information to make an informed decision about the adequacy or appropriateness of the Warranty in light of the Defect vis-à-vis other garbage disposal brands' warranties;

j. There was a substantial disparity between the Parties' bargaining power such that Plaintiffs were unable to derive a substantial benefit from the Warranty. A disparity existed because InSinkErator was aware that the Badgers were inherently defective, Plaintiffs and Class Members had no notice or ability to detect the Defect, InSinkErator knew Plaintiffs and Class Members had no notice or ability to detect the Defect even if they could have inspected the Badgers prior to purchase due to the latency of the Defect, and InSinkErator knew that Plaintiffs and Class Members would bear the cost of correcting the Defect. This disparity was increased by InSinkErator's knowledge that failure to disclose the Defect would substantially limit the Badger's use and could cause it to fail altogether;

k. InSinkErator failed and refused to extend the time limitation of the Warranty to cover the Defect, which was known to InSinkErator and unknown to consumers at the point of sale;

l. Plaintiffs and Class Members had no ability to discover the Defect at the time of sale due to the latency of the Defect, and without being experts on material selection in garbage disposals;

m. The durational limits on the Warranty are grossly inadequate to protect Plaintiffs and Class Members from the Defect;

n. InSinkErator sold the Badgers with knowledge of the Defect and of the fact that it may not manifest until after expiration of the Warranty;

o. InSinkErator sold the Badgers with knowledge of the Defect and of the fact that the Badgers would fail well before the expiration of their useful lives;

---

al-specifications-en-us-6320196.pdf (last visited Aug. 23, 2023, later archived and available at https://web.archive.org/web/20230621223748/https://insinkerator.emerson.com/documents/badIn SinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf (last visited Oct. 13, 2025)).

Deleted: CORRECTED

p. InSinkErator sold the Badgers with knowledge of the Defect and of the fact that the Warranty would not cover corrosion, [redacted];

q. InSinkErator sold the Badgers with the knowledge that the nature of the Defect precludes any repair to the Defect or resulting damage, such that only replacement can temporarily prevent damage to other property;

r. InSinkErator sold the Badgers knowing it was replacing Badgers with more defective Badgers that would or were likely to fail;

s. InSinkErator sold the Badgers knowing that they were not capable of being repaired or replaced with non-defective Badgers within the Warranty period, or thereafter;

t. Plaintiffs and Class Members would have negotiated better terms in the purchase of their Badgers and Warranty had they been aware of the Defect, and been able to negotiate such terms;

u. The terms of the Warranty unreasonably favor InSinkErator over Plaintiffs and Class Members;

v. InSinkErator excluded rusting and/or corrosion from coverage under its Limited Warranty knowing that rusting and/or corrosion indicates premature failure, and may lead to leaking and catastrophic property damage which can be covered but occur after the Warranty period; and

w. InSinkErator failed to warn consumers in its Warranty that rusting and/or corrosion indicates premature failure, and may lead to leaking and property damage.

358. Moreover, as corrosion occurs over time, perforation or holes in the housing and UEF may not manifest until after the expiration of the Warranty, resulting in InSinkErator's denial of the Warranty claim despite the existence of the Defect within the Warranty period.

359. Further, as zinc-coated galvanized steel is an inadequate material selection, design, and manufacture, InSinkErator knows that through regular and foreseeable use the Badgers will degrade, develop holes, and leak. This knowledge is further demonstrated by use of stainless steel—an appropriate material for garbage disposals—in its higher end models.

360. InSinkErator does not offer extended product warranties for purchase, and thus, the consumers have little choice but to accept the limited durational terms of the original Warranty.

361. In addition, the Warranty fails of its essential purpose in that InSinkErator is unable to repair or patch the corrosion or repair the Defect given that corrosion causes material loss to the

Deleted: CORRECTED

steel itself, and instead InSinkErator is only able to replace corroded Badgers with equally defective Badgers.

362. To the extent that InSinkErator offered to replace, or did replace, the defective Badgers, replacement as a remedy fails its essential purpose given it is insufficient to make Plaintiffs and Class Members whole because the Warranty covering the Badgers provides that InSinkErator will replace the Badgers with identical, equally defective Badgers. Specifically, in its course of business, when InSinkErator opts to provide a replacement Badger to complaining consumers, the replacement Badger likewise contains the Defect, resulting in the same risks to the owners, and the same or similar damages can occur to the replacement Badgers and the owners' personal property. Accordingly, recovery by Plaintiffs and Class Members is not restricted to the promises in any written Warranty, and they seek all remedies that may be allowed under law.

363. Any purported limitation on liability included as a part of the Warranty does not meet the requirements of such disclaimers under California law because it is discretely and inconspicuously placed in the middle of the ICU without distinction despite InSinkErator's choice to use bold and capital letters throughout the Warranty, such that it would be unlikely to be seen by consumers until well after purchasing the Badgers, if at all. Additionally, the ICU is a folded document placed inside of a sealed box, requiring the consumer to unseal the box, find and remove the ICU in order to read it.

364. The limitations also do not contain "as is" or "with all faults" as is required by California laws the subject of this litigation.

365. Furthermore, the purported limitation fails to expressly mention merchantability or implied warranties.

366. Additionally, the Warranty seeks to limit Plaintiffs and Class Members' rights to seek incidental, special, indirect, and consequential damages, including any economic loss, whether

**Deleted:** CORRECTED

resulting from nonperformance, use, misuse or inability to use the Badger or InSinkErator's or its authorized service representative's negligence. Further, the Warranty seeks to limit liability for damages caused by delay in performance and restrict, regardless of the form of the claim or cause of action (whether based in contract, infringement, negligence, strict liability, other tort or otherwise), InSinkErator's liability such that it will not exceed the price paid by the original owner of the Badger. In essence, such limitations guarantee nothing about the performance of the Badgers.

367. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Defect is unconscionable, and any such efforts to disclaim, or otherwise limit, liability for the Defect or the implied warranties is null and void.

**FED. R. CIV. P. 9(b) ALLEGATIONS**
**(Affirmative and By Omission)**

368. Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Although the Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, to the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

369. **WHO**: Defendant, its agents, and authorized retailers through Defendant's express authorization and direction, made material misrepresentations and/or omissions of material fact in its website representations, Warranty, owner's manuals, ICUs, labeling, product packaging and marketing, and in response to Warranty claims and consumer complaints online, and through authorized retailers to demonstrate that the Badgers were not defective, used galvanized steel for "Disposer Durability,"[186] were of high-quality, were "long-lasting" and/or would last at least 6–8

[186] *See id.*

Deleted: and

Deleted: of the Badgers as

Deleted: ¶

Deleted: CORRECTED

years[187] with normal use, that discovered corrosion was just "cosmetic," would not impact the service life of the product, was just "discoloration," would not impact the "structural integrity" of the disposal, and that any leakage occurred due to installation or misuse.

370. Defendant, its agents, and authorized retailers through Defendant's authorization and direction made these misrepresentations and omissions of material fact to Plaintiffs, their agents, and Class Members.

371. **WHAT**: Defendant's conduct was, and continues to be, fraudulent because it omitted and concealed that the Badgers were defective, were not durable, would damage Plaintiffs and Class Members, were not of high-quality, could not be repaired and could only be replaced with more defective Badgers, and would fail prior to the design life, industry standards, InSinkErator's represented service life for the Badgers of 6-8 years, or consumers' expected service life for garbage disposals. Defendant's employees and representatives made affirmative misrepresentations with material and relevant omissions to Plaintiffs, their agents, and Class Members at the time of purchase regarding the same qualities, when consumers contacted Defendant to make warranty claims, and in responding to online consumer complaints.

372. Further, Defendant's conduct has the effect of deceiving Plaintiffs, their agents, and Class Members into believing that the Badgers are not defective, were "durable," had an effective Warranty, and that the Badgers would not fail before the product's design life or industry standards of 10 years.

373. Additionally, Defendant's representations to consumers during warranty interactions, such as those with Plaintiff Cohen, that corrosion was cosmetic (i.e., discoloration) and

[187] *See* https://insinkerator.emerson.com/en-us/insinkerator-products/garbaInSinkErator-disposals (last visited Mar. 14, 2023).

**Deleted:** prematurely

**Deleted:** CORRECTED

would not affect the service life or the structural integrity of the Badgers were uniform and misleading and demonstrative of a pattern of deceptive conduct.

374. Defendant knew or should have known this information is material to reasonable consumers, including Plaintiffs, their agents, and Class Members, and would impact consumer choices regarding purchase and warranty, and yet it omits a necessary warning that due to the galvanized steel construction the Badgers have the propensity to fail, leak, and cause damage to other property, including flooring, cabinetry, and other surrounding areas.

375. **WHEN**: Defendant made the material misrepresentations and/or omissions detailed herein at the time: (1) Plaintiffs, their agents, and Class Members performed research on the Badgers to gather information that would aid them in selecting the best Badger to purchase; (2) Plaintiffs, their agents, and Class Members purchased the Badgers; (3) Plaintiffs, their agents, and Class Members installed the Badgers; (4) Plaintiffs, their agents, and Class Members made warranty claims; (5) InSinkErator responded to consumer complaints online; and (6) relevant hereto and continuously throughout the applicable Class period.

376. **WHERE**: Defendant's material misrepresentations and/or omissions were made on its website, through marketing materials, the Warranty, in ICUs, user manuals, on the packaging, the garbage disposals themselves, in warranty text messages and phone calls, through employees, and through authorized retailers at the direction of InSinkErator.

377. Defendant should have disclosed the nature of the Defect and/or related consequences of the Defect on its packaging, on the Badgers themselves, in the ICU similarly to where premature corrosion is described related to installation errors, in its point-of-sale materials, its website, in the Warranty, and through warranty communications.

Deleted: in warranties

Deleted: the labeling of

Deleted: and

Deleted: CORRECTED

378. **HOW**: Defendant made written misrepresentations and/or failed to disclose material facts regarding the Defect, the consequences of the Defect, and related to the true risks of normal use of the Badgers.

Deleted: regarding

379. **WHY**: Defendant engaged in the material misrepresentations and/or omissions detailed herein (*e.g.*, knowing and concealing knowledge of the Defect) for the express purpose of inducing Plaintiffs and other reasonable consumers to purchase and/or pay for the Badgers, to pay for out-of-warranty replacement Badgers, deterring consumers from understanding that galvanized steel would corrode, and avoiding covering resulting damage from the corrosion at issue. Defendant profited by selling the Badgers to many thousands of consumers.

380. **INJURY**: Plaintiffs, their agents, and Class Members purchased the Badgers when they otherwise would not have absent Defendant's misrepresentations and/or omissions, and, alternatively, paid more for the Badgers than they would have absent Defendant's misrepresentations and/or omissions.

381. Further, the Badgers resulted in out-of-pocket costs to replace the Badgers, as well as damage to other property resulting from the leaks.

**CLASS ACTION ALLEGATIONS**

382. Plaintiffs bring this lawsuit individually and as a class action on behalf of all others similarly situated pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

383. The Nationwide Class is defined as:

> All persons in the United States and its territories who either (a) purchased a new InSinkErator-manufactured Badger garbage disposal manufactured on or after December 15, 2018 or the earliest time permitted by the statute of limitations ("Badgers" or "Class Badgers"), or (b) acquired a Badger as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Badger not used by the donor or by anyone else after the donor

Deleted: CORRECTED

purchased the Badger and before the donor gave the Badger to the Class Member.

384. The California Class is defined as:

All persons in the state of California who either (a) purchased a new InSinkErator-manufactured Badger garbage disposal manufactured on or after December 15, 2018 or the earliest time permitted by the statute of limitations ("Badgers" or "Class Badgers"), or (b) acquired a Badger as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Badger not used by the donor or by anyone else after the donor purchased the Badger and before the donor gave the Badger to the Class Member.

385. Excluded from the Classes are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, and their immediate families.

386. Plaintiffs reserve the right to amend or modify the Class definitions after they have had an opportunity to conduct discovery.

387. Numerosity: Fed. R. Civ. P. 23(a)(1). The Classes are so numerous that the joinder of all Members is unfeasible and not practicable. While the precise number of Class Members has not been determined at this time, Plaintiffs are informed and believe that thousands of consumers have purchased the Class Badgers in California and nationwide.

388. Commonality: Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. whether the Class Badgers are defective;

b. whether the Class Badgers suffer from inadequate material selection, design, and/or manufacture;

c. whether the fact that the Class Badgers suffer from the Defect would be considered material to a reasonable consumer;

d. whether InSinkErator knew or should have known about the Defect before, during, or after distribution of the Badgers to Plaintiffs, Class Members, and/or retailers;

e. whether InSinkErator concealed from and/or failed to disclose to Plaintiffs and Class Members the defective nature of the Badgers;

Deleted: CORRECTED

f. whether InSinkErator breached its Warranty with respect to the Class Badgers;

g. whether InSinkErator's Warranty is unconscionable;

h. whether InSinkErator had a duty to disclose the defective nature of the Class Badgers to Plaintiffs and Class Members;

i. whether InSinkErator made misleading statements to consumers to gain additional profits and deter any warranty or legal action;

j. whether InSinkErator's conduct was unfair and/or deceptive;

k. whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction; and

l. in other ways to be supplemented as a result of discovery.

389. Adequate Representation: Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intends to prosecute this action vigorously.

390. Predominance and Superiority: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of InSinkErator's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for InSinkErator's misconduct. Absent a class action, Class Members will continue to incur damages, and InSinkErator's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

**FIRST CAUSE OF ACTION**

Deleted: CORRECTED

**VIOLATIONS OF THE CALIFORNIA LEGAL REMEDIES ACT ("CLRA"), CAL. CIVIL CODE § 1750, *ET SEQ*.**
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the California Class)**

391. Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

392. InSinkErator's conduct falls within the meaning of this statute because it caused transactions resulting in the sale or lease of goods or services to consumers – namely, the sale of defective Badgers.

393. The Badgers are considered goods or services within the meaning of the statute under Cal. Civil Code § 1761(a) and/or the sale of the Badgers is considered a service under Cal. Civil Code § 1761(b).

394. InSinkErator constitutes a "person" within the meaning of Cal. Civil Code § 1761(d).

395. Plaintiffs and Class Members are consumers pursuant to the statute.

396. InSinkErator violated the CLRA by way of the following provisions:

a. "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

b. "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

c. "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9);

d. "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law." Civil Code § 1770(a)(14);

e. "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16); and

f. "Inserting an unconscionable provision in the contract." Civil Code § 1770(a)(19).

397. InSinkErator engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Civil Code §§ 1770(a)(5), (a)(7), (a)(9), (a)(14), (a)(16), and (a)(19) when it

**Deleted:** CORRECTED

manufactured, supplied, distributed, and/or sold Badgers which were advertised and/or warranted as "durable" for proper and reliable for food waste disposal, and which otherwise concealed a known Defect.

398. More specifically, InSinkErator misrepresented, *inter alia*, that the materials were "durable" for a "long-lasting" garbage disposal, the Badgers were "free from defects in materials and workmanship" for the Warranty Period, and that the expected service life is 6-8 years.[188]

399. InSinkErator further misrepresented in its ICUs that corrosion is cosmetic and will not affect the durability or structural integrity of the Badgers.

400. InSinkErator omitted and concealed that the Badgers were defective, were not durable and long-lasting, would damage Plaintiffs and Class Members, were not of high-quality, could only be replaced with more defective Badgers, and have the propensity to fail, leak, and cause damage to other property, including flooring, cabinetry, and other surrounding areas.

401. InSinkErator's, agents, employees, authorized retailers, and representatives made affirmative, material misrepresentations to Plaintiffs, their agents, and Class Members at the time of purchase, when consumers contacted InSinkErator to make Warranty claims, and in responding to online consumer complaints. Specifically, these misrepresentations include, as described herein, that the Badgers are durable, long-lasting, should last 6-8 years, and that corrosion is "cosmetic."

402. InSinkErator agents, employees, authorized retailers, and representatives omitted material information to Plaintiffs, their agents, and Class Members at the time of purchase, when consumers contacted InSinkErator to make Warranty claims, and in responding to online consumer

[188] *See* https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf (last visited Aug. 23, 2023, later archived and available at https://web.archive.org/web/20230621223748/https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf (last visited Oct. 13, 2025)); https://www.insinkerator.com/en-us/insinkerator-products/garbage-disposals/standard-series (last visited Aug. 22, 2025).



Deleted: CORRECTED

complaints. Specifically, InSinkErator's website, marketing materials, Warranty, ICUs, packaging, the disposals themselves, and other materials omitted that the Badgers contain a Defect and that such Defect would likely cause the Badgers to fail before the design life or industry standard expected life of 10 years.

403. InSinkErator is aware and cognizant that its representations that the Badgers worked properly are false, and that the misrepresentations and omissions are misleading.

Deleted: and

404. Had Plaintiffs, their agents, and the Class known of the Defect, they would not have paid—or would have paid substantially less—for the Badgers at issue.

405. As a result of InSinkErator's unlawful conduct, Plaintiffs and Class Members were injured and suffered damages. Plaintiffs and Class Members are entitled to recover actual, punitive, and statutory damages, as appropriate, injunctive relief and other equitable relief, including restitution, as determined by the Court, pursuant to the CLRA.

406. InSinkErator was put on written notice for violation of claims for all putative Class Members on May 18, 2023 pursuant to notice provided on behalf of California consumers and consumers nationwide in *Miller et al. v. InSinkErator, LLC.*, 1:23-cv-03797 (N.D. Ill. June 15, 2023) (Chang, J.).

407. Further written notice was provided to InSinkErator of its violations of the CLRA, in addition to breaches of warranties and violations of other consumer protection statutes on January 16, 2025 and September 11, 2025.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.**
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the California Class)**

408. Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

Deleted: CORRECTED

409. InSinkErator violated the UCL, pursuant to Cal. Bus. & Prof. Code § 17200, by engaging in "unfair competition" which is defined as "any unlawful, unfair, or fraudulent business practices [including] unfair, deceptive, untrue or misleading advertising."

410. InSinkErator's actions, as alleged herein, constitute fraudulent, unfair, deceptive, and unlawful business practices committed in violation of the UCL because it violated the CLRA, as described above.

411. All of the conduct and representations alleged herein occurred in the course of InSinkErator's business and were part of a pattern or generalized course of illegal conduct.

412. InSinkErator's conduct was fraudulent because InSinkErator failed to disclose the Defect associated with the Badgers, and related consequences stemming therefrom. Specifically, InSinkErator concealed that the Badgers were defective, were not durable or long-lasting, would damage Plaintiffs and Class Members, were not high quality, could only be replaced with more defective Badgers, would fail prior to consumer expectations, the design life of the products, industry standards, the Badgers' design life, or the 6–8 year service life of a garbage disposal, that corrosion was not merely cosmetic and would affect the service life of the Badgers, and that the Badgers had the propensity to fail, leak and cause damages to other property, including flooring, cabinetry, and other surrounding areas.

413. InSinkErator's conduct was unfair because it was specifically designed to and did induce Plaintiffs and Class Members to purchase the Badgers at issue. InSinkErator knew or should have known it was omitting information that is material to reasonable consumers, including Plaintiffs and Class Members, was in exclusive control of the material information, and omitting the information impacts consumer choices regarding purchase and warranty, in particular because InSinkErator knew the Badgers would not meet consumers' expectations, and yet it failed to

**Deleted:** CORRECTED

improve the Badger and continues to omit any warning that the Badgers have the propensity to fail, leak, and cause damage to other property, including flooring, cabinetry, and other surrounding areas.

414. InSinkErator's conduct was deceptive because it was specifically designed to and did induce Plaintiffs, their agents, and Class Members to purchase the Badgers at issue despite knowing for over a decade that they contained the Defect. Plaintiffs, their agents, and Class Members had no reason to know that the Badgers contained the Defect.

415. Plaintiffs, directly and through their agents, and California Class Members reasonably and justifiably relied on InSinkErator's conduct alleged herein. But for such conduct, Plaintiffs and Class Members would not have purchased the Badgers at issue. Had InSinkErator taken corrective action, either in altering the material selection of the Badgers or warning consumers about the Defect, Plaintiffs and Class Members would have made different purchasing decisions.

416. Additionally, the Warranty limitations and failure to disclose the potential risk due to the Defect is unfair in that they: (1) violate public policy as expressed in the California Consumer Legal Remedies Act; (2) are immoral, unethical, oppressive, and unscrupulous and substantially injurious to consumers; and (3) inflict injury on consumers which is not outweighed by any countervailing benefits to consumers or competition and the injury to consumers is one that consumers could have reasonably avoided.

417. As a result of InSinkErator's conduct, Plaintiffs and Class Members have suffered injury-in-fact, lost money, and potential damage to property, in that they have incurred actual costs to replace the Badgers upon manifestation of the Defect.

418. Plaintiffs and Class Members seek to recover from InSinkErator restitution of earnings, profits, compensation, and benefits obtained as a result of the practices that are illegal under the aforementioned statute.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISEMENT LAW ("FAL"),**

**Deleted:** CORRECTED

**CAL. BUS. & PROF. CODE § 17500, *ET SEQ*.**
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, California Class)**

419. Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

420. The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of the FAL, Cal. Bus. & Prof. Code § 17500, *et seq*.

421. Pursuant to the FAL, "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

422. Defendant marketed, labeled, and represented the Badgers as merchantable and fit for the ordinary purposes for which they were used and sold and were not otherwise injurious to consumers and their property.

423. More specifically, InSinkErator misrepresented, *inter alia*, that the materials were "durable" for a "long-lasting" garbage disposal, the Badgers were "free from defects in materials and workmanship" for the Warranty Period, and that the expected service life is 6-8 years.[189]

424. Additionally, InSinkErator misrepresented that corrosion was cosmetic, and would not affect the durability or structural stability of the Badgers.

[189] *See* https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf (last visited Aug. 23, 2023, later archived and available at https://web.archive.org/web/20230621223748/https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf (last visited Oct. 13, 2025)); https://www.insinkerator.com/en-us/insinkerator-products/garbage-disposals/standard-series (last visited Aug. 22, 2025).

Deleted: CORRECTED

425. InSinkErator made affirmative advertising statements about durability, galvanized steel, service life, warranty protection, and reliable food-waste disposal, and those statements were misleading because they omitted the existence of a Defect, repair/replacement limitations, and the consequences of the Defect including premature failure.

426. To the contrary, the Badgers contained the Defect at the time of purchase and no reasonable consumer or their agent would believe that, in light of the Defect, that the Badgers were merchantable or fit for the ordinary purpose for which they were used and sold or were not otherwise injurious to consumers and their property through leakage under cabinetry, where Plaintiffs and Class Members could not immediately identify the Defect or damage.

427. At the time of its misrepresentations, Defendant was either aware of the Defect or was aware that it lacked the information and/or knowledge required to make such a representation truthfully. Defendant concealed, omitted, and failed to disclose this information to Plaintiffs, their agents, and Class Members.

428. Defendant's descriptions of the Badgers were false, misleading, and likely to deceive Plaintiffs, their agents, and other reasonable consumers into purchasing their Badgers, and further into not taking additional warranty or legal action after making Warranty claims related to corrosion.

429. Defendant's conduct therefore constitutes deceptive or misleading advertising.

430. Plaintiffs have standing to pursue claims under the FAL as Plaintiffs directly and through their agents, as more fully described *supra*, reviewed and relied on Defendants' packaging, advertising, representations, and marketing materials regarding the Badgers when selecting and purchasing the Badgers.

431. Plaintiff Cohen likewise made a Warranty claim by text message and was subject to warranty misrepresentations at that time.

Formatted: Font: Not Bold

Formatted: Font: Not Bold

Formatted: Font: Not Bold

Formatted: Font: Not Bold

Deleted: CORRECTED

432. In reliance on the statements made in Defendant's advertising and marketing materials and Defendant's omissions and concealment of material facts regarding the quality and use of the Badgers, Plaintiffs, their agents, and Class Members purchased the Badgers.

433. Had Defendant disclosed the true nature of the Badgers (that they contained the Defect), Plaintiffs, their agents, and Class Members would not have purchased the Badgers or would have paid substantially less for them.

434. As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has ill-gotten gains and/or profits, including but not limited to money from Plaintiffs and Class Members who paid for the Badgers, which contained the Defect.

435. Plaintiffs and Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendant and by means of its deceptive or misleading representations, including monies already obtained from Plaintiffs and Class Members as provided for by the FAL.

## FOURTH CAUSE OF ACTION
**THE SONG-BEVERLY CONSUMER WARRANTY ACT**
**("Song-Beverly") (Implied Warranties),**
**CAL. CIVIL CODE § 1790, *ET SEQ*.**
**(Plaintiffs Individually and on Behalf of the Nationwide Class and/or Multi-State Class, or in the Alternative, the California Class)**

436. Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

437. Plaintiffs, individually and on behalf of all persons similarly situated and the general public, seek recovery for Defendant's breach of the implied warranty.

438. Under Song-Beverly, Cal. Civ. Code § 1792, *et seq.*, every sale of consumer goods is accompanied by both a "manufacturer's and retailer's" implied warranty that the goods are merchantable."

Deleted: CORRECTED

439. The Badgers and Badgers' parts contained therein are "consumer goods" within the meaning of Cal. Civ. Code §1791(a).

440. Defendant is a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

441. Plaintiffs, through their agents, and Class Members bought the Badgers at retail stores and online in the State of California.

442. At the time of sale, and currently, Defendant is in the business of manufacturing and selling the Badgers.

443. There is privity between Defendant, Plaintiffs and Class Members due to Defendant's direct warranties, Plaintiffs, their agents', and Class Members' direct dealings with Defendant's authorized retailers, and/or because Plaintiffs and Class Members were intended third-party beneficiaries of Defendant's implied warranties.

444. Defendant knew that the retailers to whom it sold the Badgers were not going to own Badgers any longer than it took to sell them to Plaintiffs and Class Members. Defendant knew and expected handymen, contractors, and installers who purchased the Badgers for installation in consumers homes were not going to own the Badgers any longer than it took for them to install them in Plaintiffs' and Class Members' homes. In other words, the retailers, handymen, contractors, and installers were not the intended beneficiaries or users of the Badgers.

445. Defendant intended that its implied warranties that applied to the Badgers were for the benefit of the Plaintiffs and Class Members.

446. Per Defendant's express warranty and its product marketing and literature, as described herein, Defendant's authorized retailers are not the intended beneficiaries of its warranties, express or implied, but rather Plaintiffs and Class Members are expressly intended as the beneficiaries of Defendant's warranties.

**Deleted:** CORRECTED

447. By operation of law, Defendant impliedly warranted to Plaintiffs and Class Members that the Badgers were of merchantable quality and fit for the ordinary purposes for which they are intended and used. Defendant breached its implied warranties at the time of sale.

448. California Civil Code § 1791.1(a) provides that consumer goods must meet the following requirements in order to fulfill the implied warranty of merchantability: "(1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; and (4) Conform to the promises or affirmations of fact made on the container or label."

449. The Badgers would not pass without objection in the plumbing and garbage disposal trade because they share a common Defect, which causes premature failure before the end of the Badgers' design life, before the industry standard service life, and can cause catastrophic water damage.

Deleted: the possibility of

450. The Badgers are not fit for their ordinary purpose of providing a proper and reliable method of disposing of food waste such that, *inter alia*, the Badgers contain a Defect preventing the Badgers from reliably disposing of food waste through the garbage disposal because the Badgers rust, corrode, and leak risking catastrophic property damage to cabinetry and flooring before the end of the design life and industry standard expected life of 10 years.

451. The Badgers are not adequately packaged or labeled because they do not disclose that the Badgers will cease to grind and dispose food due to the Defect, will prematurely fail, and pose a risk of catastrophic water damage.

452. The Badgers do not conform to the promises and affirmation that they are "Rugged Galvanized Steel Construction (*For Disposer Durability*" given that they will cease to grind and dispose of food due to the Defect, will prematurely fail, and pose a risk of catastrophic water damage.

Deleted: CORRECTED

453. Moreover, the Defect renders the Badgers below a minimal level of quality such that the Badgers are not merchantable for each of the following bases: (1) galvanized steel is not suitable for reliable use in garbage disposals; (2) the risk of leaks is unreasonable; (3) corrosion is an inevitable result of ordinary and normal use of the Badgers; (4) the Defect causes the Badgers to prematurely fail; (5) the Defect causes material loss that undermines the grind performance of the Badgers; and (6) the leak-protecting zinc layer is eliminated within a year.

454. Defendant knowingly and/or recklessly sold the Badgers with a Defect that made them not fit for the ordinary purpose for which they were intended and used. As alleged herein, Defendant possessed actual superior knowledge that the Badgers did not work as intended. Defendant's waiver, disclaimer, and/or limits on implied warranties are unconscionable, illegal, and unenforceable because Plaintiffs, directly or through their agents, and Class Members had no meaningful choice in determining those limitations and disclaimers; Defendant knew when it included waivers, disclaimers, and/or limits on the implied warranties that the Defect would cause premature failure and the possibility of catastrophic water damage; and in other ways described herein.

455. More specifically, Defendant's disclaimer and limitation of implied warranties under Song-Beverly is invalid under California Civil Code §§ 1790.1, 1791.3, and 1792.3 because there was no disclaimer or any language in the Badgers materials and warranty that provided or provides that the Badgers were being sold "as is" or "with all faults."

456. To the extent that Defendant may now claim that it excluded or modified the implied warranties under the California Uniform Commercial Code, such waiver is invalid because it was not conspicuous as required by the California Uniform Commercia Code § 2316(2), and as more fully described herein.

Deleted: CORRECTED

457. Plaintiffs, their agents, and Class Members were not made aware of any waiver of implied warranties at the time of their purchases of the Badgers. ICUs are packed inside sealed Badger boxes and are not provided to Plaintiffs and Class Members until after their purchases of the Badgers.

458. There was no posting of any warranty disclaimers on the Badgers, and there was no mention of any warranty disclaimer at the time of Plaintiffs', their agents', and Class Members' purchases.

459. Plaintiffs, their agents, and Class Members were not provided the option to purchase additional warranty coverage from Defendant at the time of purchase.

460. Plaintiffs are informed and believe Defendant does not provide the option to obtain additional warranty coverage outside of the limitations in the original warranty provided by Defendant.

461. Extended warranties offered for sale by retailers do not contain coverage for the implied warranties of merchantability or fitness of the Badgers for a particular purchase from Defendant.

462. Further, Defendant does not provide express warranty coverage for repair or replacement of the Badgers for the Defect and related damage.

463. InSinkErator's failure to adequately repair or replace the defective Badgers has caused the warranty to fail of its essential purpose.

464. InSinkErator was put on written notice for violation of claims for all putative Class Members on May 18, 2023 pursuant to notice provided on behalf of California consumers and consumers nationwide in *Miller et al. v. InSinkErator, LLC.*, 1:23-cv-03797 (N.D. Ill. June 15, 2023) (Chang, J.). Further written notice was provided to InSinkErator for violation of claims for all putative Class Members on January 16, 2025 and September 11, 2025.

Deleted: CORRECTED

465. Plaintiffs provided InSinkErator notice of its breach on November 5, 2024, January 16, 2025, and September 11, 2025 prior to the filing of this Complaint.

466. Moreover, InSinkErator was put on constructive notice about its breach through its review of consumer complaints, as evidenced by its responses thereto, and other reports described herein, and, upon information and belief, through product testing and knowledge of appropriate material selection such as the stainless steel used for the Shredder Assembly components.

467. Had Plaintiffs, their agents, Class Members, and the consuming public known that the Badgers were defective or would cause damage, they would not have purchased the Badgers or would have paid less for them.

468. As a direct and proximate result of the foregoing, Plaintiffs and the Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, rescission, and other relief as is deemed appropriate by law.

469. Plaintiffs and Class Members also seek punitive damages since Defendant acted with malice, oppression and fraud in performing the conduct set forth above.

**FIFTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**PURSUANT TO THE UNIFORM COMMERCIAL CODE,**
**CAL. COM. CODE § 2314, *ET SEQ*.**
**(Plaintiffs Individually and on Behalf of the Nationwide Class and/or Multi-State Class, or in the Alternative, the California Class)**

470. Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

471. InSinkErator is and was at all relevant times a merchant with respect to the Badgers, and is the manufacturer, distributor, warrantor, and/or seller of the Badgers. InSinkErator knew or had reason to know of the specific use for which the Badgers, as goods, were purchased.

472. The Class Badgers are and were at all relevant times a "good."

Deleted: CORRECTED

473. InSinkErator entered into agreements with retailers to provide the Badger garbage disposals for installation in the homes of Plaintiffs and Class Members.

Deleted: , suppliers, contractors, and/or Plaintiffs and Class Members

474. Plaintiffs and Class Members oftentimes entered into agreements with handymen, contractors, and installers to make purchases of the Badgers on their behalf, and with agency and authority afforded to that purchase.

475. Every sale of consumer goods is accompanied by a manufacturer's implied warranty that the goods are merchantable within the meaning of Cal. Com. Code § 2314.

476. InSinkErator provided Plaintiffs and Class Members with implied warranties that the Badgers (a) would pass without objection in trade under contract description; (b) were of fair and average quality within the description; (c) were fit for the ordinary purposes for which such goods were used; (d) ran, within the variations permitted by agreement, of even kind, quality and quantity within each unit and among all units involved; (e) were adequately contained, packaged, and labeled as the agreement may require; and (f) conformed to the promises or affirmations of fact made on the container or label if any.

477. However, the Badgers are not fit for their ordinary purpose of providing a proper and reliable method of disposing of food waste such that, *inter alia*, the Badgers contain a Defect preventing the Badgers from reliably disposing of food waste through the garbage disposal because the Badgers rust, corrode, and leak risking catastrophic property damage to cabinetry and flooring. Therefore, the Badgers are not fit for their ordinary purpose of properly and reliably disposing of food waste.

478. Likewise, InSinkErator knew the identity, purpose, and requirements of the Badgers as operational garbage disposals that would properly and reliably dispose of food waste such that they would not corrode through foreseeable water use or otherwise rust, corrode, prematurely fail, and leak.

Deleted: CORRECTED

479. Moreover, the Defect renders the Badgers below a minimal level of quality such that the Badgers are not merchantable on the basis that: (1) galvanized steel is not suitable for use in garbage disposals; (2) the risk of leaks is unreasonable; (3) corrosion is an inevitable result of ordinary and normal use of the Badgers; (4) the Defect causes the Badgers to prematurely fail; (5) the Defect causes material loss that undermines the grind performance of the Badgers; and (6) the leak-protecting zinc layer is eliminated within a year.

480. Plaintiffs, directly and through their agents, and Class Members have had sufficient direct dealings with either InSinkErator or one of its retailers to establish privity of contract between InSinkErator, on the one hand, and Plaintiffs and each Class Member, on the other hand.

481. Although Plaintiffs did not purchase the Badgers directly from InSinkErator, and could not, they had sufficiently direct dealings by basing their eventual purchases on InSinkErator's specifications, representations regarding the quality and durability of the Badgers, and in InSinkErator's Warranty directly benefiting Plaintiffs and Class Members.

482. Additionally, Plaintiffs and Class Members were obvious third-party beneficiaries by the language of the Warranty, including that the warranty is provided to "the original *consumer owner* of the InSinkErator product," as well as "any subsequent *owner of the resident in which the Product was originally installed.*"[190]

483. Similarly, other InSinkErator materials also indicate that Plaintiffs and Class Members were the intended third-party beneficiaries of the Badgers at issue, including through language in specification sheets that indicate the consumer is the actual user of the garbage disposals

[190] *See* https://www.insinkerator.com/documents/badger-1-warranty-en-us-120998.pdf (last visited Oct. 13, 2025).

Deleted: ¶
¶

Deleted: CORRECTED

(*e.g.* "***We Come To You***" [In-Home Limited Warranty]; "[B]y using your disposal regularly, you can help divert food waste.").[191]

484. Notwithstanding, privity is not required because Plaintiffs and each of the Class Members are the intended beneficiaries of InSinkErator's warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Badgers and have no rights under the warranties provided by InSinkErator. InSinkErator's warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were the intended beneficiaries of the Badgers.

485. More specifically, InSinkErator's manifest intent that its warranties apply to Plaintiffs and consumer Class Members as third-party beneficiaries, is evident from the statements contained in its product literature, including its Warranty, which specifically states the Badgers are to be used for residential use and the Warranty provides "in home" repair or replacement service. Likewise, it was reasonably foreseeable that Plaintiffs and consumer Class Members would be the intended beneficiaries of the products and warranties.

486. InSinkErator impliedly warranted that the Badgers were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Badgers manufactured, supplied, distributed, and/or sold by InSinkErator were proper and reliable for food waste disposal under the sink and through the plumbing system; and (ii) a warranty that the Badgers would be fit for their intended use while the Badgers were being operated.

487. Contrary to the applicable implied warranties, the Badgers, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and Class

[191] *See* https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf (last visited Aug. 23, 2023, later archived and available at https://web.archive.org/web/20230621223748/https://insinkerator.emerson.com/documents/badInSinkEratorr-1-garbaInSinkErator-disposal-specifications-en-us-6320196.pdf (last visited Oct. 13, 2025)).

Deleted: CORRECTED

Members with reliable and durable methods of food waste disposal. Instead, the Badgers suffer from a defective design and/or manufacture, as alleged herein.

488. InSinkErator's failure to adequately repair or replace the defective Badgers has caused the warranty to fail of its essential purpose.

489. InSinkErator breached the implied warranties because the Badgers were sold with the Defect, which substantially reduced and/or prevented the Badgers from being used for proper and reliable food waste disposal.

490. InSinkErator was put on written notice for violation of claims for all putative Class Members on May 18, 2023 pursuant to notice provided on behalf of California consumers and consumers nationwide in *Miller et al. v. InSinkErator, LLC.*, 1:23-cv-03797 (N.D. Ill. June 15, 2023) (Chang, J.). Further written notice was provided to InSinkErator for violation of claims for all putative Class Members on January 16, 2025 and September 11, 2025.

491. Plaintiffs provided InSinkErator notice of its breach on November 5, 2024 January 16, 2025, and September 11, 2025 prior to the filing of this Complaint.

492. Moreover, InSinkErator was put on constructive notice about its breach through its review of consumer complaints, as evidenced by its responses thereto, and other reports described herein, and, upon information and belief, through product testing and knowledge of appropriate material selection such as the stainless steel used for the Shredder Assembly components.

493. Had Plaintiffs, their agents, Class Members, and the consuming public known that the Badgers were defective or would cause damage, they would not have purchased the Badgers or would have paid less for them.

494. As a direct and proximate result of the foregoing, Plaintiffs and the Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**Deleted:** CORRECTED

**SIXTH CLAIM FOR RELIEF**

**VIOLATIONS OF THE MAGNUSON-MOSS CONSUMER PRODUCTS LIABILITY ACT ("MMCPWA"),**

**15 U.S.C. § 2301, *ET SEQ.***

**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the California Class)**

495. Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

496. The MMCPWA, 15 U.S.C. § 2301, *et seq.*, provides a private right of action to purchasers of consumer products against retailers who, *inter alia*, fail to comply with the terms of a written warranty, express warranty, and/or implied warranty.

497. As demonstrated above, Defendant has failed to comply with the terms of its implied warranties on the Badgers that it manufactured, advertised, marketed, and/or sold.

498. The Badgers are "consumer products" as defined in 15 U.S.C. § 2301(1).

499. Plaintiffs and Class Members are "consumers" as defined in 15 U.S.C. § 2301(3), and utilized the Badgers for personal and household use and not for resale or commercial purposes.

500. Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. §§ 2301(4) and (5).

501. Defendant provided Plaintiffs and Class Members with "written warranties" within the meaning of 15 U.S.C. § 2301(6).

502. The Badgers would not pass without objection in the plumbing and garbage disposal trade because they share a common Defect, which causes premature failure and the possibility of catastrophic water damage.

503. The Badgers are not fit for their ordinary purpose of providing a proper and reliable method of disposing of food waste such that, *inter alia*, the Badgers contain a Defect preventing the Badgers from reliably disposing of food waste through the garbage disposal because the Badgers rust, corrode, and leak risking catastrophic property damage to cabinetry and flooring.

**Deleted:** CORRECTED

504. The Badgers are not adequately packaged or labeled because they do not disclose that the Badgers will cease to grind and dispose food due to the Defect, will prematurely fail, and pose a risk of catastrophic water damage.

505. The Badgers do not conform to the promises and affirmation that they are "Rugged Galvanized Steel Construction (*For Disposer Durability*" given that they will cease to grind and dispose of food due to the Defect, will prematurely fail, and pose a risk of catastrophic water damage.

506. Moreover, the Defect renders the Badgers below a minimal level of quality such that the Badgers are not merchantable for each of the following bases: (1) galvanized steel is not suitable for use in garbage disposals; (2) the risk of leaks is unreasonable; (3) corrosion is an inevitable result of ordinary and normal use of the Badgers; (4) the Defect causes the Badgers to prematurely fail; (5) the Defect causes material loss that undermines the grind performance of the Badgers; and (6) the leak-protecting zinc layer is eliminated within a year.

507. The Badgers share a common Defect, as defined and described herein, but is not covered by the express warranty, is not acknowledged or disclosed to Plaintiffs and Class Members, is concealed by Defendant when Plaintiffs and Class Members make warranty claims, and is a risk of premature failure and catastrophic water damage.

508. Defendant's conduct as described herein, including its refusal to replace the Badgers or disclose the Defect within a reasonable time, is a failure to comply with its obligations under its implied promises and warranties.

509. Plaintiffs and Class Members fulfilled their obligations under the implied warranties.

510. There is privity between Defendant, Plaintiffs and Class Members by Defendant's direct warranties and/or because Plaintiffs and Class members were intended third-party beneficiaries of Defendant's implied warranties.

Deleted: CORRECTED

511. As a direct and proximate result of Defendant's breach of its implied warranties, Defendant has violated the statutory rights of Plaintiffs and Class Members pursuant to MMCPWA, thereby damaging Plaintiffs and Class Members in amounts to be proven at trial.

512. InSinkErator was put on written notice for violation of claims for all putative Class Members on May 18, 2023 pursuant to notice provided on behalf of California consumers and consumers nationwide in *Miller et al. v. InSinkErator, LLC.*, 1:23-cv-03797 (N.D. Ill. June 15, 2023) (Chang, J.). Further written notice was provided to InSinkErator for violation of claims for all putative Class Members on January 16, 2025 and September 11, 2025.

513. Plaintiffs provided InSinkErator notice of its breach on November 5, 2024 January 16, 2025, and September 11, 2025 prior to the filing of this Complaint.

514. Moreover, InSinkErator was put on constructive notice about its breach through its review of consumer complaints, as evidenced by its responses thereto, and other reports described herein, and, upon information and belief, through product testing and knowledge of appropriate material selection such as the stainless steel used for the Shredder Assembly components.

## SEVENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the California Class)**

515. Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

516. InSinkErator knew that the Badgers were defective in material selection, design and manufacture, were not fit for their ordinary and intended use, and failed to perform in accordance with advertisements, marketing materials and warranties disseminated by InSinkErator, and with the reasonable expectations of ordinary consumers.

517. InSinkErator fraudulently concealed from and/or intentionally failed to disclose to Plaintiffs, their agents, and the Class that the Badgers are defective, are not "durable" or "long-

Deleted: CORRECTED

lasting," would prematurely fail, and that the damages were not the result of consumer usage, mishandling or installation errors.

518. InSinkErator had exclusive knowledge and/or control of the defective nature of the Badgers at the time of sale and at all other relevant times. The Defect is latent and not something that Plaintiffs, their agents, or Class Members, in the exercise of reasonable diligence, could have discovered independently prior to purchase.

519. InSinkErator had the capacity to, and did, deceive Plaintiffs, their agents, and Class Members into believing that they were purchasing Badgers free from defects. InSinkErator repeatedly told Plaintiffs and Class Members that the Defect was merely cosmetic.

520. InSinkErator undertook active and ongoing steps to conceal the Defect. Plaintiffs are not aware of anything in InSinkErator's advertising, publicity, or marketing materials that disclosed the truth about the Defect, despite InSinkErator's awareness of the problem for decades.

521. The facts concealed and/or not disclosed by InSinkErator to Plaintiffs and Class Members are material in that a reasonable person would have considered them important in deciding whether to purchase (or to pay the same price for) the Badgers.

522. InSinkErator intentionally concealed and/or failed to disclose material factors for the purpose of inducing Plaintiffs, their agents, and the Class Members to act thereon.

523. InSinkErator exercised control over the material facts, including the presence of the Defect, such that they were not readily available to Plaintiffs and the Class Members.

524. Plaintiffs and Class Members justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the Badgers.

525. Plaintiffs and Class Members suffered a loss of money in an amount to be proven at trial, *inter alia*, as a result of InSinkErator's fraudulent concealment and nondisclosure because: (a) they would not have purchased the Badgers on the same terms if the true facts concerning the

Deleted: CORRECTED

defective Badgers had been known; (b) they would not have paid a price premium for the Badgers if they knew of the Defect and that the Badgers were likely to fail prematurely and cause damage; and (c) the Badgers did not perform as promised or as expected.

526. Had Plaintiffs, Class Members, and the consuming public known that the Badgers were defective or would cause damage, they would not have purchased the Badgers or would have paid less for them.

527. By reason of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer damage and injury.

**EIGHTH CLAIM FOR RELIEF**
**(IN THE ALTERNATIVE)**
**BREACH OF CONTRACT/BREACH OF COMMON LAW WARRANTY**
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the California Class)**

528. Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

529. To the extent InSinkErator's commitment is deemed not to be a warranty under the Uniform Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.

530. Plaintiffs, their agents, and Class Members purchased the Badgers from InSinkErator or through retailers such as Home Depot, Lowe's, Amazon, and other home good stores and authorized retailers.

531. InSinkErator expressly warranted that the Badgers were fit for their intended purpose and that they were free of defects in materials, durable for garbage disposers, should last 6–8 years under normal, foreseeable use, and suitable for proper and reliable disposing of food waste under a sink and through plumbing.

Deleted: CORRECTED

532. These warranties and other representations made by InSinkErator formed a contract between Plaintiffs, Class Members and InSinkErator.

533. InSinkErator made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiffs, Class Members, and InSinkErator on its website, through marketing materials, in its Warranty, in user manuals, on the labeling of the packaging and product, in warranty text messages, through employees, and through authorized retailers.

534. InSinkErator breached the warranties and/or contract obligations by placing the defective Badgers into the stream of commerce and selling them to consumers, when it knew the Badgers contained the Defect, were prone to premature failure, and did not properly and reliably dispose of food waste. These deficiencies substantially and/or completely impair the use and value of the Badgers, and cause damage outside of the Badgers to cabinetry and flooring.

535. The deficiencies described existed when the Badgers left InSinkErator's possession or control and were sold to Plaintiffs, their agents, and Class Members. The deficiencies and impairment of the use and value of the Badgers were not discoverable by Plaintiffs or Class Members at the time of the purchase of the Badgers.

536. Plaintiffs and Class Members relied on InSinkErator's express representations and warranties in purchasing the Badgers.

537. As a direct and proximate cause of InSinkErator's breach of contract, Plaintiffs and Class Members were harmed because they would not have purchased the Badgers if they knew the truth about the defective condition of the Badgers.

538. As a direct and proximate result of the foregoing, Plaintiffs and the Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

Deleted: CORRECTED

**NINTH CLAIM FOR RELIEF**
**(IN THE ALTERNATIVE)**
**UNJUST ENRICHMENT**
**(Plaintiffs Individually and on Behalf of the Nationwide Class or, in the Alternative, the California Class)**

539. Plaintiffs hereby adopt and incorporate by reference all foregoing allegations as though fully set forth herein.

540. This alternative claim is asserted on behalf of Plaintiffs and Class Members to the extent there is any determination that any contracts between Plaintiffs, Class Members and InSinkErator do not govern the subject matter of the disputes with InSinkErator, or that Plaintiffs do not have standing to assert any contractual claims against InSinkErator.

541. Plaintiffs through their agents and Class Members conferred a monetary benefit on InSinkErator, and InSinkErator had knowledge of this benefit. The average price paid by Plaintiffs and Class Members for the Badgers was more than $100.00.

542. Given the reusable mount for replacement disposals, Plaintiffs and Class Members replaced defective Badgers with more defective Badgers, paying out of pocket the full price of the Badger again and prior to the expected service life.

543. Plaintiffs, their agents, and Class Members purchased Badgers on the belief that they were purchasing a reliable disposer of food waste. However, the Badgers were not a reliable disposer of food waste such that, *inter alia*, the Badgers contain a Defect preventing the Badgers from reliably disposing of food waste through the garbage disposal because the Badgers rust, corrode, and leak risking catastrophic property damage to cabinetry and flooring.

544. InSinkErator omitted and concealed that the Badgers were defective, were not durable or long-lasting, would damage Plaintiffs and Class Members, were not of high-quality, could only be replaced with more defective Badgers, and would fail prematurely.

545. Plaintiffs and Class Members had no reason to know that the Badgers were defective.

**Deleted:** CORRECTED

546. InSinkErator omitted and concealed that the Badgers were defective so that they could make an increased profit and Plaintiffs and Class Members would continue to purchase the Badgers.

547. By its wrongful acts and omissions described herein, including selling the defective Badgers, InSinkErator was unjustly enriched at the expense of Plaintiffs and Class Members.

548. Plaintiffs and Class Members' detriment and InSinkErator's enrichment were related to and flowed from the wrongful conduct alleged in this Complaint.

549. It would be inequitable for InSinkErator to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the defective Badgers.

550. Plaintiffs and Class Members seek restitution from InSinkErator and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by InSinkErator from its wrongful conduct and establishing a constructive trust from which Plaintiffs and Class Members may seek restitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of himself and all others similarly situated, respectfully request that this Court:

A. Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Award damages, including compensatory, exemplary, and statutory damages, to Plaintiffs and the Classes in an amount to be determined at trial;

C. Grant restitution to Plaintiffs and the Classes and require InSinkErator to disgorge its ill-gotten gains;

D. Permanently enjoin InSinkErator from engaging in the wrongful and unlawful conduct alleged herein;

E. Award Plaintiffs and the Class Members their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

**Deleted:** CORRECTED

F. Award Plaintiffs and the Class Members pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

G. Award such further relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: September 8, 2026

Respectfully submitted,


/s/ *Thomas A. Pacheco*
Thomas A. Pacheco, CA SBN 351445
**LEE SEGUI PLLC**
421 N. Harrington St., Suite 460
Raleigh, NC 27603
Telephone: (919) 421-7782
tpacheco@leesegui.com

Harper T. Segui
**LEE SEGUI PLLC**
825 Lowcountry Blvd., Suite 101
Mount Pleasant, SC 29464
Telephone: (843) 790-6520
hsegui@leesegui.com

Alex R. Straus, CA SBN 677434
**MILBERG LLC**
80280 South Beverly Drive, Penthouse
Los Angeles, California 90212
Telephone: (914) 471-1894
astraus@milberg.com

Jonathan Feavel**
**FEAVEL & PORTER, LLP**
Vincennes, IN 47591
Telephone: (812) 886-9230
Facsimile: (812) 866-9161
feavel@feavelandporter.com

*Attorneys for Plaintiffs and Proposed Classes*
**Admitted Pro Hac Vice*


**Deleted:** CORRECTED

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 8, 2026 the foregoing document was filed via ECF which will send electronic notification to all attorneys registered for ECF-filing.

/s/ Thomas Pacheco
Thomas Pacheco, CA SBN 351445
LEE SEGUI PLLC
421 N. Harrington Street, Suite 460
Raleigh, NC 27603
Tel: (919) 421-7782
tpacheco@leesegui.com

*Attorney for Plaintiff*